**E. C. ERNST, INC., Appellant in No. 79–2290,**

v.

**KOPPERS COMPANY, INC., Appellant in Nos. 79–2184, 79–2320.**

Nos. 79–2184, 79–2290 and 79–2320.

United States Court of Appeals, Third Circuit.

Argued March 21, 1980.

Decided July 25, 1980.

Arthur S. Friedman (argued), Peter F. Gass, Emanuel Kapelsohn, Friedman & Gass, New York City, Gerald S. Lesher, Baskin & Sears, Pittsburgh, Pa., for E. C. Ernst, Inc.

Harold R. Schmidt (argued), Edward C. Schmidt, Brian W. Asbaugh, Edward B. Wood, Karl Alexander, Rose, Schmidt, Dixon, Hasley, Whyte & Hardesty, Pittsburgh, Pa., Templeton Smith, Pittsburgh, Pa., for Koppers Co.

Before SEITZ, Chief Judge, and GARTH and HIGGINBOTHAM, Circuit Judges.

### OPINION OF THE COURT

SEITZ, Chief Judge.

The plaintiff, E. C. Ernst, Inc., and the defendant, Koppers Co., both appeal from a final judgment in this diversity case involving Pennsylvania law of construction contracts.

### I.

In the late spring of 1973, the defendant entered into a contract with Jones & Laughlin Steel Corp. (J&L) under which the defendant was to act as general contractor for the construction of a coke battery at J&L's Aliquippa, Pennsylvania, plant. The coke battery was to be modeled on a similar facility being built by the defendant in Indiana. Both involved some novel technology for loading and preheating coal prior to its conversion to coke.

After drawing up plans and soliciting bids for subcontractors, the defendant en-

tered into a contract in June of 1974 with the plaintiff under which the plaintiff would be the electrical subcontractor on the Aliquippa project. This contract called for a completion date in June 1975.

As work progressed, difficulties developed. Problems at the Indiana site required the defendant to modify the original plans for the Aliquippa job. These modifications, and other reasons, required the plaintiff to do extra work not contemplated in the original contract with the defendant. In addition, a variety of factors led to delays in completing the project. As a result, the plaintiff incurred extra expense because it had to work into the winter of 1975. The project was completed in January 1976, approximately six months late.

The plaintiff filed this diversity suit raising several claims. Count 1 of the complaint sought damages for the plaintiff's expenses incurred due to the defendant's delay. The district court found the defendant liable but did not award damages on this count, a ruling the plaintiff contests on appeal.

Count 2 sought recovery of extra costs due to additional work done by the plaintiff. This extra work was done pursuant to "drawing revisions" submitted by the defendant to the plaintiff. "Drawing revisions" are changes in the original drawings and specifications upon which the original contract is based. The district court calculated damages of $1,484,000 on this count but deducted $500 from each separate drawing revision, leaving a total of $1,421,920. The defendant appeals the liability and damage aspects of this ruling, and the plaintiff appeals the $500 deduction.

Count 3 of the complaint involved additional work done by the plaintiff pursuant to field authorizations and directives issued by the defendant. The defendant appeals the district court's award of damages of $9,581.64 on this count.

In addition, the defendant counterclaimed to recover for services supplied to the plaintiff during the construction of the coke battery. The defendant appeals the district court's denial of those claims. Finally, the defendant appeals the district court's award of prejudgment interest.

## II.

We first consider count 1, which dealt with damage to the plaintiff due to delays in completing the project. The district court made several findings with respect to the cause of the delay. It first found that the plaintiff was not responsible for the delay. It then concluded that the defendant was responsible for all of the delay. *See E. C. Ernst, Inc. v. Koppers Co.*, 476 F.Supp. 729 (W.D.Pa.1979). Because the defendant was responsible for all the delay, there was no need for the district court to apply the rule of *Lichter v. Mellon-Stuart Co.*, 305 F.2d 216 (3d Cir. 1962), which deals with apportioning damages where the defendant is responsible for some, but not all, of the delay.

The plaintiff sought to prove its damages by using a variation of the "total cost" approach. Essentially, this method requires calculation of actual cost and of cost under the contract. The contract figure is then subtracted from the actual cost to find damages due to delay.

The district court denied damages for two reasons. First, it found that the plaintiff's method of proof was too hypothetical and artificial. Second, the court rejected the total cost approach as a method of proving damages. *See* 476 F.Supp. at 753.

■ At the outset, the district court incorrectly rejected the total cost method because we believe that Pennsylvania, if faced with the question, would approve of that approach. Generally, under Pennsylvania law, damages need not be proved with mathematical certainty, only reasonable certainty. *E. g., Exton Drive-In, Inc. v. Home Indemnity Co.*, 436 Pa. 480, 261 A.2d 319, 324 (1970). Moreover, evidence of damages may consist of probabilities and inferences. *See generally* 11 P.L.E. *Damages*, § 158. We believe that a method that permits subtraction of contract cost from actual cost satisfies those standards. The objections normally made to the approach,

such as that the bid may not be a reasonable estimate, can be adequately handled by making them a question of fact in each case.

This is not to say, however, that a plaintiff merely may label damages evidence as being under the total cost method and leave the matter at that. Under the total cost method, at a minimum the plaintiff must provide some reasonably accurate evidence of the various costs involved. *Cf. Seger v. United States*, 469 F.2d 292, 303–04, 199 Ct.Cl. 766 (1972) (improper to merely divide the total actual cost by the number of days involved). In general, where the damages are due to delay, there are a variety of costs generated to the subcontractor. These include extra hours expended, whether because the men are idle or otherwise, increases in wages because the work is done at a later time, and so forth. Here the main controversy centers on the extra manhours created by the delay.[1]

The plaintiff's witness on delay hours, Robert Anthony, who made his calculations after the project was completed, testified that he computed damages as follows: Anthony first figured the total number of journeyman hours expended on the project by the plaintiff. He then calculated what the amount of manhours under the contract would have been absent the delay by averaging three estimates prepared by the plaintiff at the time of the bid. Anthony then subtracted this amount from the total number of manhours. He also subtracted manhours that either were not covered by count 1 or for which the plaintiff received compensation.

This left a total of roughly 100,000 manhours, which represented the total number of delay hours expended on the project. The problem was that this figure covered a three year period from 1974 to 1976, and

the plaintiff paid different wage rates for those years. To allocate the number of delay hours to each year, Anthony utilized the following approach. He decided that the major cause for delay was the extraordinary number of drawing revisions submitted by the defendant to the plaintiff. *See* note 1 *supra*. He therefore calculated what percentage of drawing revisions were submitted in each year in question. Anthony then multiplied the total manhour figure due to delay above by each percentage to arrive at delay manhours per year (*i.e.*, delay manhours times percentage of drawing revisions submitted in 1975 equals delay manhours for 1975). Finally, he multiplied the number of manhours so calculated for each year by the relevant wage rate to come up with a damage figure.

The district court found the use of the drawing revisions as a basis for allocating the delay manhours objectionable. It stated: "Ernst's hypothetical allocation of unpaid journeyman hours on the basis of the number of drawing revisions received per year is invalid. Not all drawing revisions required work by Ernst, and all revisions requiring work would not cause an equal amount of work. Thus, a calculation based on an artificial method of allocation is not a proper substitute for a calculation based on historical expenditure [on] labor." 476 F.Supp. at 753.

We cannot say that the district court erred in its assessment of the testimony of Anthony. Indeed, its objection to Anthony's allocation of the delay hours to the various years is well founded. Anthony's assumption seems to have been that because 38.9% of the drawing revisions were submitted in 1974, then 38.9% of the delay hours occurred in 1974. As the district court noted, this is not supported by logic or fact.[2] Because the number of drawing revi-

---

1. In this regard it is important to distinguish extra hours generated by the delay and extra hours created by the work required under the various drawing revisions. The latter is the subject of count 2, which we discuss below. For convenience, we will refer to the former as "delay hours" to denote the fact that they are

hours that would not have been expended without the delay.

2. Indeed, Anthony's own reason for utilizing the number of drawing revisions contradicts his method. He stated that he used the number of drawing revisions as a measure because the more revisions there were in one year, the

sions in and of itself had no relation to the amount of delay hours generated and because Anthony admitted that he made no analysis of the impact the revisions had on the amount of delay hours, the plaintiff's evidence simply was not geared to revealing when the delay hours occurred.

Even though the district court properly rejected Anthony's testimony as to allocation of delay hours, we believe that a remand is necessary. The district court found that the defendant is liable for all the delay, and we have reviewed the evidence and the defendant's contentions and conclude this ruling was not erroneous. Thus the district court's opinion has the effect of finding liability with no damages even though it recognized that the plaintiff had suffered some damage and that the defendant was entirely responsible for this damage.

Here, the plaintiff seems to have relied on Anthony's testimony as the heart of its case. We also note that the briefing has been less than instructive. Our independent examination has revealed, however, that other portions of the record may provide a basis for damages. For example, Anthony himself compared his own method to other methods to prove its accuracy. We express no view on the adequacy of any of this evidence. We do believe that in the interest of justice the district court should, in the first instance, consider this record and make additional findings of fact and conclusions of law on damages. Accordingly, we reverse and remand on count 1.

### III.

### A.

Count 2 of the complaint involved plaintiff's recovery for extra work done by it pursuant to drawing revisions of the original contract submitted by the defendant to the plaintiff. The defendant raises two

issues with respect to the district court's award of damages to the plaintiff.

### 1.

The 1974 contract between the plaintiff and the defendant contained a clause that dealt with the plaintiff's claims for extra work performed pursuant to drawing revisions submitted by the defendant. The clause first required the plaintiff to submit claims in writing for extra costs within 30 days of receipt of a drawing revision from the defendant. The plaintiff then was not to do any work covered by the drawing revision until it received written authorization from the defendant.

During 1975, the plaintiff did work without complying with this clause, which the defendant argues bars its claim for payment for that work. The district court found that the defendant was estopped from relying on the 30-day clause due to the following facts: At the beginning of 1975, the problems at the Aliquippa project due to the difficulties at the project in Indiana, which was the model for the Aliquippa project, became acute. Moreover, J&L became quite adamant about having the project completed by the end of 1975. As a result, the defendant submitted a large number of drawing revisions to the plaintiff. Although there were 289 drawings in the plaintiff's original bid, the defendant submitted over 1,300 drawing revisions, about 20% of which arrived after the projected completion date for the plaintiff's work.

These revisions were marked "approved for construction," and the district court found that they led to "massive" changes in the scope of the contract and "affected Ernst's ability to perform its work." The district court found that "[b]ecause of the frequency of drawing revisions, the time involved in comparing bid drawings with revisions and in pricing extra materials

more compressed the work would become in the next year. Yet this assumes the effect of the drawing revision is not felt until subsequent years, whereas his actual method seems to assume that the effect is generated in the very year the drawing revision is submitted.

The plaintiff also points to the fact that it did over one-half of the work after the projected completion date. That work was either required under the contract or is covered by count 2 and therefore reveals nothing in itself about allocation of delay hours.

. . ., and the paramount desire of Koppers and J&L, communicated daily to Ernst, to complete the project, Ernst generally proceeded with the work required rather than make drawing price proposals [pursuant to the 30-day clause] to Koppers." 476 F.Supp. at 740.

Pursuant to this course of conduct, on May 30, 1975, the plaintiff wrote to the defendant requesting that the 30-day clause be waived as a condition to the plaintiff remaining on the project. Having received no response, on July 2 the plaintiff wrote to the defendant that it felt that defendant agreed with it that the 30-day clause was waived.

The defendant challenges the district court's finding of estoppel on several grounds. First, it argues that the district court held that the defendant was estopped from relying on the 30-day clause because of its silence in the face of the May 30 letter and that estoppel by silence is not part of the law of Pennsylvania. *See Brown v. Haight*, 435 Pa. 12, 255 A.2d 508 (1969). *Brown*, however, does not absolutely prohibit estoppel by silence. It merely limits such estoppel to those cases where the party in question has a duty to speak. *See* 255 A.2d at 512. In any event, while the district court did speak in terms of estoppel by silence, we do not think that its opinion, read as a whole, rested solely on the sending of the two letters by the plaintiff to the defendant as the defendant seems to suggest.

Instead, the district court was looking at all the facts, which show more than mere passive acquiescence by the defendant. The defendant submitted a huge number of revisions that drastically changed the scope of the work. It then pressed the plaintiff to hurry and complete the work, which left the plaintiff with little time to compute costs and submit them. *Cf. Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 430 Pa. 550, 244 A.2d 10 (1968) (owner estopped where he requested the general contractor do extra work and promised to pay for it). In addition, the plaintiff notified the defendant that it felt this situation required dispensing with the 30-day clause.

Seen in this light, the district court's reference to the defendant's obligation to speak out makes sense. We cannot say that the court erred in concluding that a defendant that creates such a difficult situation for completion of the contract as that here and who has notice of the plaintiff's state of mind should speak out and say it intends the letter of some clause of the contract to be followed.

Second, the defendant argues that the plaintiff did not justifiably rely in good faith on the defendant's actions. This contention is rebutted by the structure of the 30-day clause and the facts. Under the last sentence of the clause, the plaintiff was not to proceed with work upon which it submitted a claim until the defendant gave written approval. Here, the drawing revisions said they were "approved for construction," and the amount and frequency of them surely indicated that they would engender extra cost. Thus the plaintiff could have reasonably believed that the defendant was not requiring compliance with the written-authorization provision. This, in addition to the fact that the entire contract was being massively changed, could reasonably lead the plaintiff to believe in good faith that the defendant did not intend to rely on the other parts of the 30-day clause.

We will affirm the district court's finding that the defendant was estopped from relying on the 30-day clause.

### 2.

The defendant next challenges the adequacy of the plaintiff's proof on the value of its extra work done on the project. This controversy centers mainly on certain pricing sheets prepared internally by the plaintiff that contain valuations of the work in question.

The defendant first contends that the pricing sheets do not satisfy the business records exception to the hearsay rule because the proper foundation for admission of the sheets was not made. *See* Fed. R.Evid. 803(6). This argument is without

merit. The custodian of the records testified that he had helped prepare the sheets, that this was done routinely on every project and was not done in anticipation of litigation, that the sheets were checked for accuracy, that there was an established procedure (which was followed in this case) for preparing such information, and that all of this was done in the routine course of business. Hence, the plaintiff's foundation satisfies all the elements of rule 803(6). In effect, the defendant would have us reevaluate this foundation evidence, a matter properly left to the district court's discretion.

The defendant also claims that the sheets do not support the amount of damages awarded by the district court. We find no support in the record for this assertion. The defendant either provides no citation to the record for these assertions or the citations provided do not say what the defendant says they do. Having examined the defendant's contentions, we hold that the district court properly concluded that the sheets were reliable estimates of the amounts involved. *See* 476 F.Supp. at 755–56.

### B.

The plaintiff challenges the district court's deduction of $500 from its claims under each drawing revision under count 2. The contract between the plaintiff and the defendant provided:

> [A reasonable change in the contract is a] drawing revision that constitutes an addition or deletion due to changes in motors which cause an increase or decrease in conduit and wire size, addition or deletion of lighting, addition of drives, starters, etc. not shown in the Bid drawings or not contained in the intent of specifications furnished. A claim for the above will be reviewed on the strict basis that the initial cost (Labor and/or materials) of 500.00 is to the account of the seller [the plaintiff].

The controversy here concerns the meaning of the phrase "the initial cost . . . of 500.00 is to the account of the seller."

The district court found that this clause meant that the plaintiff had to absorb the first $500 of each of its claims for extra work. *See* 476 F.Supp. at 741, 756. The plaintiff argues instead that the clause means that the plaintiff would absorb claims under $500 but that any claim over $500 is entirely recoverable from the defendant.

The plaintiff argues that the clause is ambiguous, permitting use of parol evidence to explain its meaning. *See Mellon Bank v. Aetna Business Credit, Inc.,* 619 F.2d 1001 (3d Cir. 1980). The plaintiff points to the testimony of several witnesses that supports its reading of the clause. We cannot determine, however, whether the district court disregarded this testimony because it thought it was barred by the parol evidence rule or whether it admitted the evidence but disregarded it because it found the testimony not worthy of belief. The district court failed to explicitly refer to the testimony. Indeed, the district court merely stated a conclusion on the question without any elaboration whatsoever. Because we are already remanding on count 1, we will remand for the district court to make findings of fact and conclusions of law on this question under Fed.R.Civ.P. 52(a). We leave to the district court whether the record on this point should be supplemented.

### IV.

Count 3 of the complaint also involved extra work performed by the plaintiff pursuant to field directives and authorizations. The defendant raises two challenges to the district court's award of damages.

First, the defendant argues that the document on which the claim rested was improperly admitted into evidence. The Western District of Pennsylvania has adopted a rule that any document not listed on the pretrial conference sheet may not be admitted into evidence. W.D.Pa.Local R. 5. The defendant claims that this rule was violated here. We disagree. The local rules also permit the court to amend the pretrial list, *id.,* and here the defendant has

not contested that it knew that the document existed and that the plaintiff was thinking of offering it in evidence. Thus there was no prejudice to the defendant, and the court did not abuse its discretion in admitting the document. *See generally Ely v. Reading Co.*, 424 F.2d 758, 763–64 (3d Cir. 1970).

■ Second, the defendant claims that the document does not support the amount awarded. Its primary argument is that the document was prepared internally by the plaintiff and was never submitted as an invoice to the defendant. The district court found that the document was reliable, and we cannot say this was incorrect. The mere fact that the figures were not submitted as an invoice does not make them so inherently unreliable that they could not be used.

## V.

The defendant filed a counterclaim for engineering and other services supplied to the plaintiff during the course of the project. The court denied recovery on these claims because it found that the services had been paid for by the owner and by the plaintiff. *See* 476 F.Supp. at 757. The defendant claims, in contradiction to the court's finding, that the plaintiff did not pay for the services of some electrical engineers.

We note at the outset that resolution of this dispute has not been easy due to inadequate preparation of a record for appeal. The appendix does not contain certain exhibits or transcript portions relied on by the parties. The briefs on this issue at points tend to be cryptic and seem to assume that we have full knowledge both of all the facts underlying the dispute and of certain practices of the construction industry. Moreover, the references at trial to the various invoices and exhibits was confusing and somewhat inconsistent. Although we have examined the evidence in detail, we remind counsel of the importance of proper presentation of facts for appellate resolution.

The record reveals that the defendant issued extra work order 136 to the plaintiff and that the plaintiff paid for the services covered by order 136. The defendant now argues that it only bills engineering services under field receipts, not extra work orders, and that therefore extra work order 136 does not cover the services of the engineers in question.

■ Although one witness testified that engineers' services are only covered by field receipts, other evidence in the record suggests that the defendant did include engineers' services in extra work orders. Indeed, some of the evidence seems to suggest that extra work order 136 included the services of the engineers here. The defendant had the burden of proving that extra work order 136 did not include the engineering services in dispute, and it was for the district court to weigh the various evidentiary bases for the parties' theories. We thus cannot say that the court was clearly erroneous in finding that the plaintiff paid the defendant for the services.

## VI.

Finally, the defendant challenges the court's award of prejudgment interest on the claims for extra work. The defendant argues that Restatement of Contracts § 337(a), which it says represents Pennsylvania law, does not permit prejudgment interest because that section only permits such interest on liquidated claims and the plaintiff's claims are not liquidated.

Assuming § 337(a) is the applicable standard, it provides no comfort to the defendant. In comment E, one of the examples of liquidated damages is a fixed sum for "labor done." Because the amounts in question here represent claims for extra work done under the contract, the only question is whether the damages were sufficiently fixed to be liquidated.

■ Under Pennsylvania law, the mere fact that the amount of liability is contested does not mean that the amount is not liquidated. *See Oxford Manufacturing Co. v. Cliff House Building Corp.*, 224 Pa. Super. 387, 307 A.2d 343, 345 (1973). Here, once the plaintiff did the extra work, the

defendant owed it money. Moreover, the sum due could be fixed by fairly objective means such as reference to the rates in the 1974 contract, the cost of the materials, and other similar sources. *See Gloecker v. Imrie*, 118 Pa.Super. 441, 179 A. 883, 885 (1935) (awarding general contractor prejudgment interest on claims against owner for extra work).

Accordingly, we will affirm the award of prejudgment interest.

## VII.

We will reverse and remand the judgment of the district court for further proceedings on count 1 and on the deduction of $500 from each claim on count 2, both of which are the subject of the appeal in No. 79–2290. We will affirm the judgment in all other respects, which includes the matters raised in Nos. 79–2184 and 79–2320.