**E. C. ERNST, INC., Plaintiff,**

v.

**KOPPERS COMPANY, INC., Defendant.**

**Civ. A. No. 77–1045.**

United States District Court,
W. D. Pennsylvania.

Aug. 14, 1981.

832

Baskin & Sears, Pittsburgh, Pa., Friedman & Gass, New York City, for plaintiff.

Rose, Schmidt, Dixon, Hasley, Whyte & Hardesty, Pittsburgh, Pa., for defendant.

OPINION

WEBER, Chief Judge.

This protracted litigation arises out of a multi-million dollar construction project undertaken by Koppers Co. Inc., at the Aliquippa Works of the Jones & Laughlin Steel Corporation. The Plaintiff, E. C. Ernst, Inc., was the electrical subcontractor hired by Koppers for this project. In this diversity action Ernst is suing Koppers to recover for work done on the project beyond that specified in the contract and for delay damages.

At the outset we recognize that, in this case, we do not write on a blank slate. Quite the contrary, since 1977 this matter has been the subject of extensive ongoing litigation, both in this court and in the Court of Appeals. The issues presented in this litigation have been the subject of a 23 day bench trial and have received exhaustive consideration, both at trial and on appeal. See, *E. C. Ernst, Inc. v. Koppers Co., Inc.*, 626 F.2d 324 (3d Cir. 1980); *E. C. Ernst, Inc. v. Koppers Co., Inc.*, 476 F.Supp. 729 (W.D.Pa.1979).

As a result of this process the issues now remaining for this court's consideration have been narrowed considerably. Presently this case is before the court for the purpose of making additional findings of fact and conclusions of law as mandated by the Court of Appeals. The parties have agreed to present these issues for resolution on the record developed in the initial trial of this matter. Therefore, the issues remanded to this court by the Court of Appeals are now ripe for our determination.

I. BACKGROUND

In June of 1973, Koppers Co. Inc. entered into an agreement with Jones & Laughlin Steel Corporation to design engineer and construct a coke oven battery at J & L's Aliquippa Works. The proposal submitted by Koppers for the Aliquippa project was extremely ambitious in scope. It involved the incorporation of several unique design features into the Aliquippa Works' coke oven battery. Specifically the design submitted by Koppers was unique in its method of preheating coal and charging the ovens' furnaces. At the time of its construction the Aliquippa coke oven battery was only the fifth commercial application of this particular process in the world. It, therefore, was contemplated by the parties that the project's design would be subject to change as experience was gained with this particular process. Under the terms of this agreement the Aliquippa facility was to be functional by June 17, 1975.

Following this agreement Koppers' Engineering Department developed plans and specifications for the work to be subcontracted on this project. One such item of work was the installation of electrical materials. On June 4, 1974, Koppers awarded the electrical materials subcontract for this project to E. C. Ernst, Inc.

From the outset Koppers encountered enormous difficulties in the construction of this project. Several independent factors contributed to these difficulties. For example, the price of materials rose dramatically during the course of this construction as a result of the lifting of Federal Price Controls. In addition engineering difficulties encountered in other, similar coke oven batteries made it necessary for Koppers to substantially revise the design of the Aliquippa facility. These revisions were far in excess of those originally contemplated by the parties. Finally, Koppers itself exacerbated these problems by failing to adequately supervise and coordinate construction on this project.

Ultimately, because of these factors, the scope of the Aliquippa project had to be increased by some 70%. J & L however

would only allow the time for completion of this project to be expanded by 27% to January 1, 1976. Therefore, in order to complete the project within the time constraints imposed by J & L, Koppers was obliged to undertake a crash program of construction.

Under this crash program Koppers had to add 654,000 hours of direct labor to the 928,000 hours already allocated to the project. This additional work was performed by 450 men, with more than two-thirds of the work committed to the last six months of the project. This crash program also resulted in a dramatic increase in the number of man hours spent on the project by the various subcontractors. In Ernst's case these problems eventually increased the estimated man-hours spent on the project by more than 100%.

On September 12, 1977, E. C. Ernst filed this action in the United States District Court for the Western District of Pennsylvania. The plaintiff's complaint in this case proceeded on three counts. In Count I Ernst claimed damages resulting from the delays caused by the voluminous changes in the Aliquippa project. In Count II Ernst sought payment for the extra work it had undertaken as a result of drawing revisions made by Koppers on this project. In Count III Ernst demanded compensation for certain specific work performed pursuant to field authorizations issued by Koppers. Koppers counterclaimed for the cost of the supporting personnel it provided for this job and for the premium time it paid to Ernst to prevent delays.

The matter was tried non-jury before the Honorable Daniel J. Snyder, District Judge.[1] At the conclusion of this 23 day trial, Judge Snyder filed an extensive opinion.

In this opinion the District Court rejected the plaintiff's Count I claim for damages in its entirety. The court acknowledged that delays had occurred on this project and that these delays were caused exclusively by Koppers. Yet the court held that a damages award was inappropriate for two reasons. First, the court indicated that the total cost method of proof employed by the plaintiff at trial was invalid as a matter of law. The court then assumed the validity of the total cost approach but concluded that, even under this approach, the plaintiff's proof of damage was insufficient to support an award under Count I. Specifically the court concluded that the plaintiff had failed to properly allocate these delay hours over the three years Ernst worked on the project.

With respect to the plaintiff's Count II claim the court concluded that Ernst was entitled to payment for its additional labor on the drawing revisions made by Koppers. The court deducted $62,080 from this claim, however, holding that these deductions were required under paragraph six of the agreement between Ernst and Koppers.

The court also found in favor of Ernst on Ernst Count III claim for work performed pursuant to field authorizations. Finally, the court rejected all of Koppers' counterclaims.

Both parties appealed this decision to the United States Court of Appeals for the Third Circuit. The Court of Appeals, in its opinion, affirmed the District Court's findings with respect to the plaintiff's Count III claim for damages and the dismissal of the defendant's counterclaim. The Court then remanded this case back to the district court for further findings of fact and conclusions of law on the plaintiff's first two damages counts. The Court of Appeals concluded that it was error for the District court to reject the plaintiff's Count I claim for delay damages. The appellate court indicated that, under Pennsylvania Law, the total cost method was an acceptable approach to use in calculating damages. The Court also indicated that it believed damages could be properly assessed from the existing record in this case. Therefore the Court of Appeals held that "the district court should, in the first instance, consider this record and make additional findings of

---

1. During the pendency of the appeal in this action Judge Snyder passed away. Therefore, this matter has been re-assigned to this court for further proceedings.

fact and conclusions of law on damages." *Ernst v. Koppers*, supra, 626 F.2d at 329. In addition the Court of Appeals directed that the district court should make further findings with respect to the deduction of $62,080 from the plaintiff's Count II damages claim.

## II. COUNT I DAMAGES

■ At the trial of this action the plaintiff attempted to prove its Count I delay damages through a variation of the total cost approach. Generally, this method of proof requires computation of both the contract costs and the actual costs of the project. The contract cost is then subtracted from the actual cost to determine costs due to delay.

In this case the variation of the total cost approach employed by the plaintiff reflected the fact that this was a labor intensive contract. Essentially, what the plaintiff proposed to do was calculate the total number of man hours Ernst spent on the project. From this figure the plaintiff then deducted the estimated man hours Ernst would have employed on the project if there had been no delay. The plaintiff also deducted from this figure those man hours that were attributable to work done on drawing revisions or pursuant to field authorizations, work which was being claimed elsewhere in its complaint. The remaining figure represented the total number of delay hours encountered by Ernst on this project.

The plaintiff then proposed to allocate these delay hours over the three years that Ernst worked on the project—1974, 1975, 1976. Ernst contended that the leading cause of delay on this project was the enormous number of drawing revisions made by Koppers. Therefore, Ernst proposed to allocate these delay hours by distributing them over the three years of the project in direct correlation to the number of drawing revisions made in that year. For example, if 39% of these drawing revisions were made in 1974 then 39% of the total delay hours would be allocated to 1974. Finally by multiplying the number of delay hours per year by the applicable labor rate for that year, Ernst obtained a dollar value for the delay hours.[2]

As we have previously noted the trial judge rejected this approach holding that the total cost method was invalid and that, even under that method, the plaintiff's proof of damage was insufficient to sustain an award. This finding was specifically reversed by the Court of Appeals and we were directed to make additional findings of fact and conclusions of law regarding these Count I damages.

Given these facts, a threshold question raised by the parties involves the scope of this court's discretion in making additional findings of fact and conclusions of law following this remand from the Court of Appeals. Ernst argues that the questions left open for our resolution on remand are quite narrow. According to the Plaintiff it was clearly established at trial that delays occurred on this project and that all of these delays were Koppers' fault. In fact the total number of delay hours has already been roughly calculated at 100,000. These findings were affirmed by the Court of Appeals. Therefore, according to Ernst, the fact of damage has already been established conclusively and all that we need do is determine the amount of those damages. Koppers, on the other hand, argues for a more expansive view of this court's discretion on remand. Essentially Koppers argues that this court still must independently determine whether Ernst has suffered any compensable injury at all as a result of delays in this project. Not surprisingly, Koppers contends, for a number of reasons, that Ernst cannot establish any right to damages under Count I. Therefore, Koppers urges that we once again deny Ernst's Count I claim in its entirety.

■ In making findings on remand, it is clear that our discretion is limited by the mandate of the Court of Appeals, and that

---

2. By the parties' agreement the hourly rates in 1974 were $19.30, and in 1975, $20.77, and in 1978, $22.98. See *Ernst v. Koppers*, 476 F.Supp. at p. 752.

matters foreclosed by that mandate are not now open to consideration by this court. See e. g. *National Airlines, Inc. v. International Association of Machinists and Aerospace Workers*, 430 F.2d 957 (5th Cir. 1970) *cert. den.* 400 U.S. 992, 91 S.Ct. 456, 27 L.Ed.2d 440 (1970); *Rachal v. Allen*, 376 F.2d 999 (5th Cir. 1967); *Noel v. United Aircraft Corp.*, 359 F.2d 671 (3d Cir. 1966); *Fontainbleau Hotel Corp. v. Crossman*, 286 F.2d 926 (5th Cir. 1961). Moreover, in construing the mandate of the Court of Appeals we recognize that the Court's opinion forms part of that mandate. See, e. g. *Noel v. United Aircraft Corp.*, supra; *Bailey v. Henslee*, 309 F.2d 840, 843 (8th Cir. 1962). We, therefore, will rely on that opinion to define the scope of our discretion on remand.

■ In this case we feel that the mandate of the Court of Appeals, as expressed in the opinion of that Court, is narrowly circumscribed. It is apparent that the Court of Appeals believes that the total cost method is an acceptable way of proving damages in this case. See *Ernst v. Koppers*, supra, 626 F.2d at 327. This question therefore is no longer open for our consideration. Moreover the Court of Appeals has agreed with the trial judge that Koppers was responsible for all of the delay on this project and that this delay damaged the plaintiff. See *Ernst v. Koppers*, supra, 626 F.2d at 329. By accepting these findings the Court of Appeals has, in effect, determined that Ernst has established the fact of damage. We must, therefore, also accept this fact as conclusively established.

Given these findings by the Court of Appeals we feel that our duty on remand does not entail independently determining whether Ernst was damaged by this delay. That fact has already been conclusively determined. Rather our responsibility is merely to allocate and assess the amount of these delay damages. In fact any other action on our part would have the anomalous "effect of finding liability with no damages even though it [is] recognized that the plaintiff had suffered some damage and that the defendant was entirely responsible for this damage." *Ernst v. Koppers*, supra, 626 F.2d at 329. Since this result was specifically condemned by the Court of Appeals in its opinion it cannot now be adopted by this court. We will then proceed with the assessment of damages.

■ In order to accurately assess delay damages in this case we must resolve two factual questions. First, we must determine how many delay hours Ernst encountered during the course of this construction project. Second, we must establish when during the course of this project these delay hours occurred. Once we determine the total number of delay hours and establish when that delay occurred it is a simple matter to determine the total value of this delay damage claim. One need simply multiply these delay hours by the applicable labor rate to determine that amount.

At trial, the plaintiff contended that 114,500 of the 289,476 productive journeymen hours it spent on the project were incurred as a direct consequence of Koppers' acts and omissions. Ernst then argued that this figure represented the total number of delay hours on the project. The trial judge, however, rejected this delay hour figure for two reasons. First, these 114,500 delay hours included 10,000 hours expended by Ernst on a temporary light and power contract. According to the trial judge, the work done on this separate contract had already been paid for in full. See *Ernst v. Koppers*, supra, 476 F.Supp. at 753. Therefore, inclusion of these 10,000 hours among the delay hours was improper. In addition the trial judge indicated that the total number of delay hours was overstated because it was based on an erroneous estimate of how many hours it would have taken Ernst to complete the project had no delay occurred. At trial the plaintiff had used the figure of 82,980 man hours to represent the time it would have originally spent on the project. The trial judge, however, felt that the figure of 100,470 man hours was a more accurate estimate of time necessary to complete the project, absent delay. See *Ernst v. Koppers*, supra, 476 F.Supp. at 753. Therefore, the estimate used by Ernst understat-

ed the number of hours Ernst would have spent on the project by some 17,490 man hours. As a result of this error Ernst's calculation of delay hours would be overstated by a similar amount. These were the only criticisms made by the trial judge of the plaintiff's calculation of the total number of delay hours.

On this record we believe that these criticisms are justified. It would appear that the plaintiff's estimate of the total number of delay hours is overstated by some 27,490 man hours. We, therefore, would deduct this amount from the total number of delay hours claimed by the plaintiff at trial. This leaves a balance of 87,010 man hours, all of which we feel are properly allocable to delays caused by Koppers Company.[3]

Distributing these man hours over three years Ernst spent on the project presents a much more difficult problem. As we have previously noted, at trial Ernst attempted to allocate these delay hours per year in direct correlation to the number of drawing revisions done in that year. This approach was, quite properly, rejected by the trial court and the Court of Appeals for two reasons. First, there was no direct relationship between man hours spent by Ernst on this project and specific drawing revisions. In fact, many drawing revisions required no work at all on Ernst's part. Second, it was agreed that the impact of a drawing revision was not felt until sometime after that revision was made. Therefore, drawing revisions made in 1974 would not necessarily result in delays in 1974. Rather that delay would occur at some later point in the project. See *Ernst v. Koppers, supra,* 626 F.2d at 328–329.

We believe that these delay damages can be more accurately assessed by considering the project as a whole, rather than by attempting to tie delay hours to specific drawing revisions. The Aliquippa project was, as we have noted, plagued by delays virtually from its outset. As early as May 30, 1974, the project was approximately six weeks behind schedule. See *Ernst v. Koppers, supra,* 476 F.Supp. at 736. Thereafter, the delay rapidly became worse.

Ultimately, by means of a crash program of construction Koppers was able to complete the project but only after it had fallen some five months behind schedule. See *Ernst v. Koppers, supra,* 476 F.Supp. at 748.

These delays had a particularly marked impact on Ernst. Ernst was a follow-on contractor; that is, Ernst could only perform its work after other contractors had prepared the work area. Therefore, these construction delays encountered at the outset of the project had the effect of totally foreclosing Ernst from beginning much of its work. For example, on August 22, 1974, a Koppers' job site analysis showed that of 339 total activities for electrical subcontractors, 332 were not available. As of October 17, 1974, 329 activities could not start; on November 17, 1974, 317 could not start. In fact, as late as January 9, 1975, 282 activities—approximately 82% of the total activities—were still unavailable. Therefore, as a result of these delays, the vast majority of the work initially subcontracted to Ernst could not be commenced until after January, 1975. In fact, as late as June of 1975, the original completion date of the project, Ernst still had not completed half of the work it was scheduled to do on this project. See *Ernst v. Koppers, supra,* 476 F.Supp. at 736, 748.

These delays were further exacerbated by the voluminous drawing changes made by Koppers on this project. Many of these drawing revisions required substantial work on Ernst's part. In fact, in a number of instances, Ernst had to remove and reinstall work previously done in order to accommodate these changes. See *Ernst v. Koppers, supra,* 476 F.Supp. at 740. The impact of these drawing revisions fell on Ernst primarily during the later stages of this project. Over 60% of these revisions were made after January of 1975, with over 20% occurring later than June of 1975. See

---

**3.** We note that the total we reach is, in our view, consistent with the Court of Appeals' conclusion that Ernst encountered "roughly 100,000" man hours of delay on this project. See *Ernst v. Koppers, supra,* 626 F.2d at 328.

*Ernst v. Koppers*, supra, 476 F.Supp. at 740, 752–753. All of the delays occasioned by these extensive drawing revisions would necessarily fall after January of 1975.

As for those revisions made before January of 1975, as we have previously noted, the plaintiff would have felt their impact sometime after the revision itself was made. See *Ernst v. Koppers*, supra, 476 F.Supp. at 752. Therefore, it is also fair to conclude that many of these changes affected Ernst's operations after January of 1975.

The impact of these delays on Ernst's operations is dramatically demonstrated by a comparison of two of plaintiff's trial exhibits (numbered 258 and 224). Plaintiff's Exhibit 224, dated August 8, 1974, is a weekly breakdown of Ernst's projected manpower requirements for this project from August 1974 to August 1975. Plaintiff's Exhibit 258 is a Koppers' memorandum dated June 1, 1977, which contains a graph indicating the approximate man power allegedly used by Ernst on the project. Comparing Ernst's projected man power allocations with its actual man power usage we find that the two were remarkably consistent through November of 1974. Thereafter, the actual manpower allocations began to deviate significantly from the projections until, by August of 1975, actual manpower on the job was three times greater than that projected by Ernst at the outset of construction. At this time Ernst had nearly 200 men at work on this construction site. Moreover, these enormous manpower allocations by Ernst continued far beyond the original completion date of the project, June, 1975. Ernst continued to employ over 100 men on this project until December of 1975, some five months after the anticipated completion date of the work. In fact, Ernst continued to assign laborers to this project well into the early part of 1976.

■ All of this evidence, we believe, demonstrates that delay damages in this case should be allocated to the year 1975. As a follow-on contractor Ernst could not begin its work until other contractors had performed their construction tasks. As we have seen delays from the outset of this project made it impossible for Ernst to begin much of its contract work until sometime after January 1975. This delay in the contract work was further aggravated by the numerous drawing revisions made by Koppers on this project. Again the impact of the vast majority of the drawing revisions fell on Ernst after January, 1975. Ultimately we find that, while Ernst was able to work within its manpower projections throughout 1974, the manpower it allocated to this job had to be increased far beyond all projections in 1975. This enormous outlay of man hours in 1975 admittedly represents a number of factors, including work done on drawing revisions and field authorizations. However, we also feel that it represents the impact of Koppers' inefficiencies and delays upon Ernst's operations. We, therefore, will allocate all of the delay hours occurring on this project to the year 1975.

In reaching this result we recognize that we are not allocating delay hours with absolute mathematical certainty. We do not feel, however, that such certainty is required in a case such as this where the defendant's responsibility for all delays has been conclusively established. Rather, in this case, we feel that proof of damages to a reasonable certainty is all that is necessary or possible. See e. g. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562–63, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931); *Ernst v. Koppers*, supra, 626 F.2d at 327; *Compania Pelineon de Navegacion v. Texas Petroleum Co.*, 540 F.2d 53, 56 (2d Cir. 1976), *cert. denied* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977).

We believe that we have obtained such certainty in this case. Admittedly some of these delays may have been felt by Ernst as early as 1974. But, on the other hand, it is apparent that Ernst worked on this project well into the winter of 1975–1976. See *Ernst v. Koppers*, supra, 476 F.Supp. at 737. In fact some drawing revisions were still being made on the project in 1976. See *Ernst v. Koppers*, supra, 476 F.Supp. at 752. Therefore, Ernst may well have encoun-

tered some delays as late as 1976. On balance, however, the evidence in this record convinces us that the overwhelming majority of the delay hours encountered by Ernst occurred in 1975. Accordingly, we will use the labor rate agreed upon by the parties for 1975 in assessing delay damages. In 1975 Koppers agreed to pay Ernst, $20.77 per hour for its journeymen labor. Applying this labor rate to the total number of delay hours, 87,010, we obtain a sum of $1,807,197.70. This amount we believe accurately represents Ernst's losses due to Koppers' inefficiency and delays on this project.

■ Finally, we believe that Ernst is entitled to an award of prejudgment interest on this Count I damage claim. Under Pennsylvania law, "(i)f a claim is liquidated, the party whose payment . . . has been withheld is entitled to prejudgment interest as a matter of right. . . ." *Sun Shipbuilding & Dry Dock Co. v. U.S. Lines, Inc.*, 439 F.Supp. 671, 675 (E.D.Pa.1977), *aff'd.* 582 F.2d 1276 (3d Cir. 1978). Moreover, as the Court of Appeals noted in this case, the mere fact that liability is contested does not mean that damages cannot be liquidated. See, *Ernst v. Koppers*, supra, 626 F.2d at 332–33.

In this case the Court of Appeals has evinced a belief that delay damages can be accurately assessed. See, *Ernst v. Koppers*, supra, at 329. Our independent review of the record has demonstrated that these damages can be established with reasonable certainty. Therefore, we feel that these claims are not so speculative as to prevent the awarding of prejudgment interest as a matter of right.

■ However, even if this claim is not liquidated, and the plaintiff is not entitled to prejudgment interest as a matter of right, we would still award such interest in this case. Under applicable Pennsylvania law "if . . . [a] claim is not for a liquidated sum, the decision on whether [to] award [prejudgment] interest is within the sound discretion of the court." *Glus v. G. C. Murphy Co.*, 629 F.2d 248, 258 (3d Cir. 1980); see, e. g. *Sun Shipbuilding & Dry Dock Co.*,

supra; *Hussey Metals Division v. Letromelt Furnace Division*, 417 F.Supp. 964 (W.D.Pa. 1976), *aff'd.* 556 F.2d 566 (3d Cir. 1976). In this case we believe that the equities lie heavily in favor of the plaintiff, Ernst. Therefore, the proper exercise of our discretion would require the payment of prejudgment interest on this claim.

Koppers Company was aware, from the outset of construction, that the Aliquippa project was encountering enormous delays. Koppers could, and apparently did, recognize that these delays would result in additional costs for itself and its subcontractors, including Ernst. Yet Koppers refused to recognize the validity of these claims, even after Ernst submitted a request for delay damages on May 31, 1977. By doing so Koppers has successfully evaded any payment of these claims for more than four years. Furthermore, the structure has been completed and in use by the owner for all of this period.

. Given these facts we feel that it is proper that Koppers now be required to pay interest on this delay damage claim. Therefore, we will order the payment of prejudgment interest on the plaintiff's Count I damage claim at the rate of 6% per annum, from May 31, 1977 to the present. See, *Sun Shipbuilding & Dry Dock Co.*, supra.

## III. COUNT II DAMAGES

The second issue for our consideration on remand involves the trial court's deduction of $62,080 from the plaintiff's Count II claim for drawing revision damages. In its opinion the court concluded that these deductions were required under paragraph six of the purchase order, which states that:

[A reasonable change in the contract is a] drawing revision that constitutes an addition or deletion due to changes in motors which cause an increase or decrease in conduit and wire size, addition or deletion of lighting, addition of drives, starters, etc., not shown in the bid drawings or not contained in the intent of the specifications furnished. A claim for the above will be reviewed on the strict basis that

the initial cost (labor and/or materials) of $500 is to the account of the Seller [Ernst].

At the time of trial counsel for the parties presented two differing interpretations of this provision. Defendant contended that paragraph six represented a deductible clause. Under defendant's interpretation the initial $500 in costs attributable to each and every drawing revision claim would be absorbed by Ernst. The plaintiff rejected this interpretation of the purchase order agreement. Instead, the plaintiff asserted that paragraph six established a claims threshold. This construction of the purchase order resulted in the exclusion of all drawing revision claims valued at less than $500, but required full payment of any claim in excess of $500.

The practical effect of these two different theories can easily be demonstrated by a hypothetical example. Assume in a given case that Ernst performed $550 in additional work as a result of a drawing revision made by Koppers. Under the defendant's theory this drawing revision would result in $50 worth of additional liability on Koppers' part. ($550 minus $500 deductible equals $50 claim). Under the plaintiff's theory, however, once the $500 threshold is exceeded all drawing revision costs are owed. Accordingly, in our hypothetical, Koppers would owe Ernst the full cost of the drawing revision, $550. Of course, in instances where the drawing revision costs were less than $500 the effect of the "deductible" and "threshold" theories is the same.

At trial the plaintiff presented testimony which supported its construction of paragraph six of the purchase order. Despite this testimony the District Court, in its opinion, concluded that the clause operated as a deductible. See Ernst v. Koppers, supra, 476 F.Supp. at 741; 476 F.Supp. at 756. The District Court's discussion of this issue, however, was quite cursory. In fact, the District Court's opinion completely failed to mention the parol evidence submitted by the plaintiff on this issue. Instead, without discussion, the court adopted the construction of paragraph six urged at trial by Koppers.

On appeal Ernst challenged the District Court's construction of this contract provision, contending that the trial judge improperly disregarded the parol evidence submitted by the plaintiff. In its opinion the Court of Appeals noted that "the District Court merely stated a conclusion on the question [of the interpretation of paragraph six] without any elaboration whatsoever." Ernst v. Koppers, supra, 626 F.2d at 331. Because the District Court's discussion of this parol evidence was incomplete the Court of Appeals concluded that it could not "determine ... whether the District Court disregarded this testimony because it thought it was barred by the parol evidence rule or whether it admitted the evidence but disregarded it because it found the testimony not worthy of belief." Ernst v. Koppers, supra, 626 F.2d at 331. The Court of Appeals, therefore, elected to remand this issue to the District Court for further findings of fact and conclusions of law.

As we understand the Circuit Court's opinion, our task on remand is to resolve two distinct, but closely interrelated questions. First, is parol evidence properly admissible in this case to explain or modify the terms of paragraph six of the purchase order? Second, does paragraph six act as a deductible provision or does it establish a claims threshold?

In this instance we believe that paragraph six of the purchase order is clear and unambiguous on its face. Therefore, we conclude that that provision is not susceptible to parol modification. Moreover, we feel that paragraph six requires the deduction of $500 from each and every drawing revision claim. We, therefore, hold that this provision acts as a deductible clause. Accordingly, we will not disturb the conclusions arrived at by the Trial Judge with respect to the Count II damages.

The parol evidence rule is something of a misnomer. It is, in fact, not a rule of evidence at all. Rather, it is a substantive rule of contract law "which in the absence of fraud, accident or mistake, prohibits resort to extrinsic evidence to

vary the meaning of a contract when the language of the contract is unambiguous." *Whitmer v. C.I.R.*, 443 F.2d 170, 173 (3d Cir. 1971). See, e. g. *Mellon Bank, N.A. v. Aetna Business Credit*, 619 F.2d 1001, 1008–1014 (3d Cir. 1980); *Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265, 1271 (3d Cir. 1979); *In re Breyer*, 379 A.2d 1305, 1309, 475 Pa. 108 (1977); *Robert F. Felte, Inc. v. White*, 302 A.2d 347, 451 Pa. 137 (1973). Moreover, in Pennsylvania the parol evidence rule applies with particular force when, as in this case, the contract being construed is an integrated document. See, e. g. *F.D.I.C. v. Barness*, 484 F.Supp. 1134, 1146 (E.D.Pa.1980); *Meyer v. W. R. Grace & Co.*, 421 F.Supp. 1331, 1334 (E.D.Pa.1976), modified 565 F.2d 152 (3d Cir. 1977); *Friestad v. Travelers Indemnity Co.*, 393 A.2d 1212, 1218, 260 Pa.Super. 178 (1978); *National Building Leasing Inc. v. Byler*, 381 A.2d 963, 252 Pa.Super. 370 (1978).

■ The plaintiff in this case does not argue that this contract was entered into through fraud, accident or mistake. Instead, the plaintiff relies exclusively on the alleged ambiguity of the contract to support its attempt to introduce extrinsic evidence. Ambiguity is defined as "intellectual uncertainty . . . the condition of admitting of two or more meanings, of being understood in more than one way, or of referring to two or more things at the same time." *Webster's Third New International Dictionary*, 66 (1966). Therefore, language in a contract is ambiguous "if, and only if, it is reasonably or fairly susceptible of different construction; it is not ambiguous if the court can determine the meaning without any guide other than a knowledge of simple facts on which, from the nature of language in general, its meaning depends." *Gerhart v. Henry Disston & Sons, Inc.*, 290 F.2d 778, 784 (3d Cir. 1961). In this case examining the language of paragraph six of the purchase order, we can find no such ambiguity. In pertinent part, that section provides that "a claim for [drawing revision expenses] will be reviewed on the strict basis that the initial costs, (labor and/or materials) of $500 is to the account of the seller [Ernst]." In our view this language

in no way supports a construction of paragraph six as a claims threshold. Quite the contrary, the language explicitly provides that, on all claims for extra work arising out of drawing revisions, "the initial cost . . . of $500" is to be borne by Ernst. The contract therefore by its express terms requires a $500 deduction from any drawing revision claim.

In its brief Ernst presents two arguments in support of its contention that this language is ambiguous. First, Ernst contends that the meaning of paragraph six of the purchase order is unclear from the face of the document itself. The plaintiff points out that the drawing revisions which are the subject of this claims provision are defined in the contract as "an addition or deletion due to changes in motors which cause an increase or decrease in conduit and wire size, addition or deletion of lighting, addition of drives, starters, etc. not shown in the bid drawing or addition of drives, starters, etc. not contained in the intent of the specification furnished." According to Ernst, if reasonable contract revisions include deletions from drawings then a contract revision could actually reduce the amount of work expected of Ernst on this project. Yet paragraph six of the purchase order requires that Ernst be charged with the first $500 in costs resulting from every drawing revision. Therefore, Ernst argues, this paragraph could conceivably allow Ernst to be charged with the initial cost of drawing revisions that required no work on its part. For this reason Ernst contends that paragraph six is facially ambiguous.

■ We do not feel, however, that this strained construction of paragraph six justifies the conclusion that that provision is ambiguous. It is a basic principle of contract law that "contracts should be interpreted in a way which makes sense." *Operative Bricklayer's U. No. 64 v. Bricklayer's Local U. No. 1.*, 45 F.R.D. 429, 431 (E.D.Pa. 1968). In this case Ernst contends that the language of paragraph six is ambiguous. However, to support this contention Ernst proposes an alternate reading of that sec-

tion that is both unreasonable and contrary to the language of the contract. Paragraph six of the purchase order does not state that Ernst will be liable for the first $500 in costs resulting from every drawing revision made on the project. Such an interpretation of the contract would be nonsensical since many drawing revisions required no work by Ernst. See *Ernst v. Koppers, supra*, 476 F.Supp. at 753. Instead paragraph six speaks exclusively in terms of claims for compensation resulting from extra work done by Ernst on drawing revisions. It provides that $500 will be deducted from each such claim. Obviously, if a drawing revision did not require additional work on Ernst's part then no claim would be appropriate and the deductible clause would not be applied.

In sum, then, we do not feel that this language is "reasonably or fairly susceptible of [the] different construction" urged by Ernst. Accordingly we conclude that this language is not facially ambiguous.

Ernst also argues that the use of parol evidence is appropriate in this case even if paragraph six of the purchase order is not facially ambiguous. Essentially, Ernst contends that the interpretation urged by Koppers is so inherently unbelievable and unreasonable that it demonstrates an ambiguity in the otherwise clear language of the contract. Therefore, extrinsic proof of the contract's meaning is necessary. To support this proposition the plaintiff relies upon the Pennsylvania Supreme Court's decision in *Consolidated Tile & Slate Co. v. Fox*, 410 Pa. 336, 189 A.2d 228 (1963).

We feel, however, that such reliance is misplaced in this case. *Fox* involved a construction contract which provided that "there shall be... no extra charges for additions or alterations which may be required to complete the work." Although this language appeared on its face to be unambiguous the court allowed the introduction of parol evidence. In its opinion the court emphasized that a literal reading of the clause could obligate the contractor to perform potentially limitless additional work at no charge. Since this literal read-

ing of the clause led to such an unusual, inequitable result the court concluded that extrinsic evidence was necessary to explain the real meaning of the agreement.

In this case, however, a literal reading of the clause in question does not lead to a bizarrely inequitable result. The plaintiff in this case is not required to undertake voluminous additional work without any prospect of reimbursement as was the plaintiff in *Fox*. Quite the contrary, Ernst has already received $1,421,920 plus interest for the work it did on these drawing revisions. Nor can it be argued that the construction of paragraph six as a deductible is totally without reasonable business justification. In fact this construction of paragraph six is completely consistent with the business justification proffered by Ernst to support its interpretation of the contract.

In its brief the plaintiff argued that the purpose behind the $500 clause in paragraph six was to prevent the processing of drawing revision claims involving less than $500. The parties apparently felt that it was uneconomical to pursue these claims because the processing costs involved would exceed the amount of the claim.

If this is the rationale behind paragraph six of the purchase order then, as we have previously noted, on claims of less than $500 the effect of either a deductible clause or a threshold clause would be exactly the same. Both will bar the processing of minor drawing revision claims. Only when a drawing revision claim exceeds $500 do these clauses act differently. On claims exceeding $500 a deductible clause has the additional effect of taxing the processing costs of the claim to Ernst. It is hardly surprising, however, to discover that the contract provides a method for allocating these claims processing costs. Nor does it appear unusual that the costs of processing these claims should be allocated to the party making the claims, Ernst. Therefore, we can find nothing so unusual or inequitable about the operation of this clause to justify the admission of parol evidence.

Accordingly, we conclude that parol evidence is not admissible in this case to modi-

fy the express terms of paragraph six of the Ernst-Koppers purchase order. We further conclude that that paragraph works as a deductible clause, requiring the deduction of $500 from each and every drawing revision claim submitted to Koppers by Ernst.

Finally Ernst argues that Koppers waived this provision because on several instances Koppers' claims adjusters accepted claims without making any deductions. See *Ernst v. Koppers*, supra, 476 F.Supp. at 755–756. We recognize that some claims were accepted in their entirety. We do not believe, however, that these isolated instances justify the conclusion that Koppers waived this contract provision. We, therefore, hold that Koppers did not waive the deductible clause contained in paragraph six.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the additional findings of fact and conclusions of law ordered by the Court of Appeals are embodied in this Opinion.

An appropriate order will issue.