**GORN CORPORATION**

**v.**

**The UNITED STATES.**

No. 326–68.

United States Court of Claims.

April 17, 1970.

Andrew J. Simons, Washington, D. C., attorney of record, for plaintiff. Walston S. Brown and Willkie Farr & Gallagher, New York City, of counsel.

Russell W. Koskinen, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

SKELTON, Judge.

This case arises out of an appeal by plaintiff, the Gorn Corporation, from a decision of the Armed Services Board of Contract Appeals (ASBCA) (ASBCA numbers 11643 and 11859, 67–1 BCA

Para. 6327). Relief is sought by plaintiff under the terms of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1964). In Count I of its petition, plaintiff seeks the amount ($10,995.11) defendant has withheld in accordance with the ASBCA decision from amounts due to plaintiff on other contracts. In Count II, plaintiff seeks recovery for lost profits and for costs of labor, materials, tooling and other items caused by the wrongful termination of the contracts in the instant case. The case is now before the court on cross-motions for summary judgment. We have concluded that judgment should be entered for the plaintiff.

Defendant, through its agent the Defense Electronics Supply Center, let two contracts for the furnishing of radio frequency switches to Coaxial Components Corporation, then a wholly owned subsidiary of Gorn Electric Company Inc.[1] Contract DSA 9–19124 was executed April 14, 1965, and contract DSA 9–19336 was signed May 3, 1965. Plaintiff contends the specifications called for switches with a voltage capacity of 28 volts direct current ("28 VDC"); defendant contends the specifications called for a voltage capacity of 115 volts alternating current ("115 VAC"). Plaintiff tendered four 28 VDC switches, and the contracting officer rejected them and terminated the contract for default. By stipulation, the only matter before the ASBCA on appeal from the default termination was whether the contracts and specifications called for 28 VDC switches or 115 VAC switches. On April 28, 1967, the ASBCA found that the contracts called for 115 VAC switches, and denied plaintiff's appeal. This decision was reaffirmed on August 17, 1967. Since the ruling of the ASBCA involved questions of law, its decision is not entitled to finality under the Wunderlich Act, 41 U.S.C. § 322 (1964), Maxwell Dynamometer Co. v. United States, 386 F.2d 855, 181 Ct.Cl. 607 (1967), and we are not bound by it.

---

1. On October 7, 1965, Coaxial Components Corporation and Gorn Electric Company, Inc., were dissolved. The Gorn Corporation, plaintiff, is successor in interest to such corporations.

On December 14, 1964, defendant requested proposals for the supplying of 136 switches. The switches were described as:

5985–984–9237

Switch, Radio Frequency

General Communications
P/N 2HNRP1–14

FXR Division P/N 300–81904

The request for proposals further advised bidders that:

The Government *does not possess drawings*, specifications or purchase data which fully describe the items called for herein. Therefore, proposals/quotations are solicited only from the cited manufacturers or suppliers who have previously furnished the item to the cited manufacturers or those who possess data which fully describes the specified product and can furnish the same in support of their proposals/quotation.

Offerors must supply complete data if alternate proposal is to be evaluated; data must be supplied with proposal. [Emphasis supplied.]

In this description, the first line "5985–984–9237" is a Federal Stock Number. The third line "General Communications P/N 2HNRP1–14" indicates the part number of a switch manufactured by General Communications Company. Apparently some time after January 1962, the numbering system was changed, and the fourth line reflects the new part number.

Using the above description as a guideline, plaintiff first issued a proposal to provide a switch identified as P/N RO2–2–15–A–1. The government rejected this proposal. Plaintiff then submitted an amended proposal for a switch identified as P/N RO2–2–15A3H accompanied by a drawing of this switch. This second switch was clearly identified in large bold letters in the drawing (plaintiff's exhibit C, shown below) as a "Coaxial Relay, *28* VDC Type RO2 Rotary Switch." [Emphasis supplied.]

[A1599]     * Arrows added.

In addition, the drawing does not contain a rectifier, which would be needed on a switch using alternating current. This proposal was accepted by the government, and the contracts were awarded.

The contract language called for switches identified as:

5985–984–9237—Switch, Radio Frequency, Coaxial Components Corp. P/N RO2–2–15A3H with electrical

specifications as outlined in General Communications dwg/part No. 2HNRP1–14.

Thus, the contracts identified the switches by plaintiff's part number, which clearly called for a 28 VDC switch. Defendant contends that not only did the specifications call for 115 VAC switches, as found by the ASBCA, but also that plaintiff's assurance in his proposal that "The Electrical Specifications for the proposed Coaxial Components Corp. P/N RO2–2–15A3H, are in accordance with the Electrical Specifications of the required FXR Division P/N 300–81904 and General Communication P/N 2HNRP1–14," removed from the defendant the burden of checking to see if plaintiff's drawings met the specifications.

The crucial issue now is whether plaintiff reasonably complied with the terms of the specifications and contracts by building the 28 VDC switches. This question turns on the government's description of the desired switches in its request for proposals, and whether this description put plaintiff on notice that only 115 VAC switches would be acceptable. We hold that plaintiff did reasonably comply with the terms of the specifications and contracts.

The first line of the government's description is the Federal Stock Number. This does not tell a prospective bidder the voltage requirements of the switches, and defendant does not allege to the contrary. The second line, "Switch Radio Frequency," likewise does not contain any voltage information.

Line 3 contains the General Communications part number, 2HNRP1–14. Defendant alleges that this number contains the clue which will unlock the mystery of the type of voltage and current required. Actually, this alleged "clue" would require a bank of computers to cross-check a long list of catalog references and tables to determine its meaning. "2HNRP1–14" was a model designation in the manufacturer's catalog. The corresponding table in the catalog stated that the switch could come in a variety of voltages, including 28 VDC and 115 VAC. It was in reliance on this statement that plaintiff submitted its clearly worded proposal to furnish 28 VDC switches. But, says defendant, this reference to the catalog is not enough. First off, model No. 2HNRP1–14 was changed to 2HN90R28DL in June 1964. (Defendant ignores plaintiff's statement that it had no knowledge of this change, nor could it have had any such knowledge, since this new number was not used or referred to in the bidding documents, but was used for the first time in connection with reprocurement after plaintiff's contract had been terminated.) Defendant then says that the switch in the manufacturer's catalog was a "R–28," which, by cross-reference tables, is found to have formerly been a "RP1." The letters following "R–28" in the new number indicate the drive voltage and refer the reader to another table, which shows that the letter "D" in the new number indicates a drive voltage of 115 VAC. The government then dug up for the ASBCA a General Communication Company drawing, No. 81905, which shows an operating voltage of 115 VAC on the pictured switch. The code in the new catalog number, plus the General Communication picture, convinced the ASBCA of the accuracy of the government's position. However, there are two critical flaws here. First, plaintiff was not on notice that the catalog number had been changed from 2HNRP1–14 to 2HN90R28DL. The government used the old number in its description of the desired switches. Second, plaintiff had no notice of the existence of the General Communication Co. drawing No. 81905, and was not put on notice of it, since the government specifically disclaimed in the request for proposals the existence of such a picture by saying: "The Government does not possess drawings * * * which fully describe the items called for herein." Further, this drawing is not a part of the contract documents.

The fourth line of the description in the request for proposals is "FXR Division P/N 300–81904." This is another

new set of numbers. The catalog drawing corresponding to this new number does not list the operating voltage, but there is a reference stating that switch model 2HN90R28DL was formerly designated 2HNRP1–14. So again the government sends the bidder to cross-reference tables, eventually winding up with the solution that letter "D" indicates 115 VAC.

■ A contractor should not be required to wade through a maze of numbers, catalogues, cross-reference tables and other data resembling crossword puzzles in order to find out what the government requires in an invitation for bids. This is especially true where, as in this case, the requirements of the government could have been clearly specified by the use of a half dozen ordinary words and figures. There would have been nothing complicated in a plain and simple statement by the government in the invitation for bids that it required "115 volt alternating current switches." If this had been done, this lawsuit could have been avoided.

■ The burden the government is attempting to assign to prospective bidders is far too onerous. We suspect that the government attorneys themselves used hindsight and devoted many hours of "Monday morning quarterbacking" to come up with their circuitous cross-checking solutions. What we have here in essence is simply this. The government put out a request for proposals, in which it stated it did not have the drawings and specifications for the subject matter of the proposal, so a general description was provided. The plaintiff read the description, and using the government-supplied part number, went to the catalog, and found that the number given described a switch that could come in a variety of voltages. Based upon this, plaintiff issued a proposal that, in contrast to the government specifications, *clearly* stated that plaintiff would furnish switches with 28 volts direct current. Defendant accepted this proposal,

and awarded the contracts to plaintiff. While the requirements for reasonable compliance vary according to the facts of the particular case, we hold that on the facts before us, plaintiff has exercised substantial compliance with the terms of the bid specifications and the contracts. Therefore, the contracts were wrongfully terminated and plaintiff should recover.

■ In any event, the most that can be said of the terms of this bid-letting, and of the government's description of the switch, is that they were ambiguous. The interpretation of the ambiguous description by plaintiff was reasonable. Therefore, the general rule applies that "Where the government draws specifications which are susceptible of a certain construction and the contractor actually and reasonably so construes them, justice and equity require that that construction be adopted." Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947). See also, Maxwell Dynamometer Co. v. United States, *supra;* L. Rosenman Corp. v. United States, 390 F.2d 711, 182 Ct.Cl. 586 (1968).

Plaintiff's motion for summary judgment is granted. On Count I of plaintiff's petition, judgment is entered for $10,995.11, the amount defendant has withheld from other amounts due plaintiff on other contracts. On Count II, the case is remanded to the Board (ASBCA) to determine plaintiff's amount of recovery, if any, because of defendant's wrongful termination of the contracts. Proceedings in the case in this court on Count II are hereby suspended for a period of 120 days from this date for such Board determination, and that part of the case is returned to the Board for this purpose. The plaintiff will comply with Rule 167 of the court. Upon the conclusion of the proceedings of the Board, the plaintiff will report the result to the court and the parties will take further action for the final disposition of the case in this court. The motion for summary judgment of defendant is denied.