**UTLEY-JAMES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 759-85C.

United States Claims Court.

May 5, 1988.

Richard F. Fellrath, Detroit, Mich., attorney of record for plaintiff. DeRenzo and Mehok, of counsel.

Elizabeth S. Woodruff, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, attorney of record for defendant.

## MEMORANDUM OPINION

LYDON, Senior Judge.

In this pre Contract Disputes Act case (41 U.S.C. §§ 601–613 (1982)), plaintiff challenges a decision by the General Services Administration Board Of Contract Appeals (Board)[1] dealing with various claims, totaling some five and one-half million dollars, asserted by plaintiff which arose during performance by plaintiff of a construction contract it entered into with the General Services Administration (GSA). Plaintiff seeks judicial review of this decision under the standards of the Wunderlich Act, 41 U.S.C. §§ 321 and 322, claiming that the decision, in certain respects, is arbitrary, capricious, grossly erroneous, not supported by substantial evidence and incorrect as a matter of law. Plaintiff also seeks damages for breach of contract. Defendant contends the decision is entitled to finality, as to the facts found by the Board, and is correct as a matter of law. Since the decision is entitled to finality under the standards of the Wunderlich Act, defendant argues, it is entitled to dismissal of plaintiff's complaint. Both parties have moved for summary judgment as the vehicle for judicial review of the Board decision.[2] Upon consideration of the submissions of the parties, the administrative decision and record, and following oral argument, the court concludes that plaintiff's motion for summary judgment should be denied and defendant's cross-motion for summary judgment should be granted.

## I.

Plaintiff and GSA entered into a contract on October 30, 1972, for the construction of the Patrick V. McNamara Federal Office Building in Detroit, Michigan. The contract price was $49,135,200. The work called for under the contract included a parking garage, plaza, and a twenty-seven story office tower. The building site occupied an entire large city block in downtown Detroit. Plaintiff, as the general contractor, was responsible for all phases of the work from foundation through the interior finish of the building. Plaintiff's own work force built the shell of the building (columns and floor slabs) with cast-in-place reinforced concrete. Almost all of the other work required under the contract was performed by subcontractors. The size of the project is evidenced by the fact that the "Specifications and Bid Forms" issued to prospective bidders, as amended, encompassed six volumes.

The contract contained the Standard Form 23–A General Provisions (October 1969 Edition), as modified by GSA's standard Modification of General Provisions (Mod–SF–23–A, February 1972 Edition). Among the clauses included in the General Provisions, as modified, were those entitled Changes (Article 3), Differing Site Conditions (Article 4), Termination for Default—Damages For Delay—Time Extensions (Article 5), Disputes (Article 6) and Suspension of Work (Article 23).

The contract also contained two different sets of General Conditions. These General Conditions, as modified, included clauses entitled Subcontracts, Shop Drawings, Coordinated Drawings and Schedules, Value Engineering Incentive Clause, Construction Progress Chart, Specifications and Drawings, Standard Details, Responsibility For Completion and Adjustment Of Contract Completion Time. Section 0118 of the specifications contained provisions under the heading "Critical Path Method Of Planning and Scheduling."

The contract originally contained a scheduled completion date of July 20, 1975, (965 calendar days from the notice to proceed). Time extensions granted by the GSA extended the completion date to November 5, 1975. Substantial completion of the contract was reached on April 16, 1976, which

---

1. *Utley–James, Inc.,* GSBCA No. 5370, 85–1 BCA 89,051 (¶ 17,816). Plaintiff's Motion for Reconsideration was denied by the Board on February 28, 1985 (Unreported).

2. As noted in *Vista Scientific Corp. v. United States,* 808 F.2d 50, 51–52 (Fed.Cir.1986), appellate review of Board decisions by this court is anomalous and occasioned, most likely, by an inadvertence on the part of the Congress when enacting the Contract Disputes Act, 41 U.S.C. § 601 et seq. (1982).

was 163 days later than the modified completion date of November 5, 1975. Plaintiff was not assessed any liquidated damages under the contract.

The contracting officer's decision in this case was issued on February 9, 1979, less than a month before the effective date of the Contract Disputes Act, *supra*. Before the Board, plaintiff complained of various government actions which evolved into claims of constructive changes, differing site conditions, compensable delays and an acceleration. The Board noted that "[t]he parties are in almost total disagreement; at times it appears that they cannot agree even on what the issues are." [3] The parties' presentations in their motions for summary judgment have not made the court's judicial review responsibilities any easier.[4]

The Board synthesized the positions of the parties as follows:

Appellant's [plaintiff's] position is generally this: (1) A series of events for which it was not responsible, such as the slippage of a foundation tieback, an operating engineers' strike, and the discovery of an unexpected underground spring delayed its progress in the early phases of the work. (2) The Government's computerized CPM (critical path method) schedule was not adjusted for these events

and did not accurately reflect what was going on in this time frame. (3) The Government, under the erroneous impression that the delays were appellant's fault, ordered appellant to accelerate, which appellant did, then gave appellant time extensions after it was too late for them to do any good. (4) The Government failed to give appellant the information it needed to do the interior finish work, and otherwise delayed the progress of the job after appellant's acceleration, so that after virtually catching up to the original schedule, appellant again fell behind in the later phases of the work. Appellant claims the costs associated with the original delays, its alleged acceleration, and the later delays to the interior work.

The Government's position is generally this: (1) The Government does not deny that early events delayed foundation work, but it contends that some of these were the responsibility of appellant or (what amounts to the same thing) its subcontractors and that others had no delaying impact on the critical path. (2) The delay on the critical path prior to the alleged acceleration directive was the result of slow concrete placement and other delays by appellant and its subcontractors and suppliers. (3) The Government

---

3. The record before the Board consisted of more than a thousand numbered exhibits and probably more than ten thousand discrete documents; together with a 6,501-page transcript reflecting a 43-day hearing. The parties' presentations to the Board, by trial and briefs, did not, according to the Board, make its task any easier. *See* 85-1, BCA at 89,100-89,101 and 89,118. As a result, the Board viewed the briefs of the parties as critical relative to what the issues were, the legal theories they relied on and the evidence supportive thereof. The Board noted that "in a case of this magnitude [the Board] cannot perform our own reconstruction of the issues and we are constrained to consider and decide the issues the parties have briefed." *Id.* at 89,101. Even so, the Board opinion ran 108 pages and contained 219 numbered findings of fact.

4. Plaintiff's brief in support of its motion for summary judgment consists, in total, of some 100 pages. Compounding the difficulty, plaintiff incorporates into this brief, by "reference", its 71-page "Petition" (complaint) which, in plaintiff's words, presents its position "in significant detail". See in this regard *Fisher v. United*

*States,* 221 Ct. Cl. 316, 317-18, n. 1, 608 F.2d 435, 436-37, n. 1 (1979). Plaintiff seems to justify this awkward and questionable practice on the 40-page brief limitation of RUSCC 83, as permitted by the court's order of June 2, 1986, (unpublished) which allowed plaintiff's motion to "increase the maximum number of pages in their briefs to 80 pages in length for principal briefs and 40 pages in length for reply briefs." Defendant moved to strike plaintiff's brief because it exceeded the page limitation of the June 2, 1986 order. By order dated February 12, 1987 (unpublished), the court denied defendant's motion stating, inter alia, "[d]efendant is right in principle, but the remedy suggested by defendant, under the circumstances, seems too harsh, expensive and time consuming. To the extent plaintiff's format and increased pagination hinders rather than helps its cause, plaintiff will have no one to blame but itself." The court empathizes with the Board relative to the presentation to it of this litigation for disposition. The court must now grapple with a similar presentation.

never directed appellant to accelerate but only told appellant that it was lagging behind the contract schedule and asked what appellant would do to catch up. (4) There is no evidence that appellant accelerated the work, but if appellant did so, it was without any directive from GSA and was done to make up its own lost time. (5) As for the later problems, they were attributable to the inability of appellant and its subcontractors to keep to the schedule; whatever appellant needed in the way of drawings or other information it received in time.

## II.

In its decision, the Board granted plaintiff's appeal in part as to entitlement and (since this was a pre Contract Disputes Act case) remanded that part to the contracting officer for a quantum determination.[5]

■ Plaintiff's motion for summary judgment presents for judicial review purposes the following issues: A. The critical path method schedule issue; B. The acceleration issue; C. The differing site condition issue; and D. The tenant layout issue.[6]

The applicable standards for the determination of the issues presented by the summary judgment motions of the parties are those established by the Wunderlich Act, *supra.* The Board's findings of fact are entitled to finality if supported by substantial evidence and are not otherwise arbitrary, capricious, fraudulent or so grossly erroneous as necessarily to imply bad faith. 41 U.S.C. § 321. Board decisions on questions of law are open to independent judicial consideration. 41 U.S.C. § 322.

■ Other criteria applicable to Wunderlich Act review of Board decisions are to be found in case law. As to the Board's findings of fact, the court's scope of review is narrow and limited. It is limited to whether there was substantial evidence to support the factual determinations made by the Board. Substantial evidence is such evidence as might convince a reasonable man to reach such determinations. Further, where two versions of the facts are equally probable, the court is generally constrained to favor the Board's version. Reasonable inferences fairly drawn from the evidence are part of the Board's prerogative.[7] If there is adequate and substantial evidence to support either of two contrary findings of fact, the one adopted by the Board is generally binding on the court. Even if the court feels the Board's factual determinations are incorrect, or disagrees with them, they are binding on the court unless it can be shown that they are subject to the derogatory language of the Wunderlich Act discussed above. *Koppers Co. v. United States,* 186 Ct.Cl. 142, 148–49, 405 F.2d 554, 557–58 (1968). Factual determinations by a Board are deemed presumptively correct. *Chaney and James Constr. Co. v. United States,* 190 Ct.Cl. 699, 720–21, 421 F.2d 728, 740 (1970). One who seeks to set aside the factual determinations of a Board carries a heavy burden. *Donald M. Drake Co. v. United States,* 194 Ct.Cl. 549, 553, 439 F.2d 169, 171 (1971). Plaintiff must show that the record

---

5. The hearing before the Board was bifurcated, only the issue of entitlement was tried, the matter of quantum, if any were due, was reserved for further proceedings. See 85–1 BCA at 89,-053, 89,118.

6. In this Wunderlich Act review case, plaintiff's claim for breach of contract damages must be dismissed. Plaintiff cannot maintain a breach of contract action on claims for which contractual relief is available administratively. *Hoel-Steffen Constr. Co. v. United States,* 197 Ct.Cl. 561, 574, 456 F.2d 760, 768 (1972). Since complete relief was available administratively, under the contract, any suit for breach of contract is consequently barred. *La Crosse Garment Mfg. Co. v. United States,* 193 Ct.Cl. 168, 172, 432

F.2d 1377, 1380 (1970) and cases cited therein. *See also Briscoe v. United States,* 194 Ct.Cl. 866, 887, 442 F.2d 953, 965–66 (1971).

7. Further, it is the Board's function to resolve conflicting evidence. *Dean Constr. Co. v. United States,* 188 Ct.Cl. 62, 70, 411 F.2d 1238, 1242 (1969); *General Dynamics Corp. v. United States,* 187 Ct.Cl. 597, 606, 410 F.2d 404, 409 (1969). Credibility of witnesses is also a Board function. *Sternberger v. United States,* 185 Ct.Cl. 528, 536, 401 F.2d 1012, 1017 (1968). Finally, the court will not reweigh the evidence before the Board to see if it would agree with each finding were it to make each such finding itself. *Dean Constr. Co. v. United States, supra,* 188 Ct.Cl. at 66, 411 F.2d at 1241.

does not support the Board's findings of fact. *Sundstrand Turbo v. United States,* 182 Ct.Cl. 31, 60, 389 F.2d 406, 422–23 (1968).[8]

As noted in *Tri–Cor, Inc. v. United States,* 198 Ct.Cl. 187, 458 F.2d 112 (1972):

> The standards of review in this court of the findings of fact in an administrative determination are not mere rules of convenience. Under Wunderlich Act criteria, administrative determinations in contract disputes of fact are conclusive and binding on this court unless the findings of fact are arbitrary, capricious or not supported by substantial evidence on the record as a whole. The standard of substantial evidence goes to the reasonableness of what the agency did on the basis of the evidence before it. *United States v. Carlo Bianchi & Co.,* 373 U.S. 709, 715, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), (footnote omitted).

*Id.* at 196, 458 F.2d at 112.

■ It is of course well established that Board determinations on questions of law are not binding on the court. *Gorn Corp. v. United States,* 191 Ct.Cl. 560, 562, 424 F.2d 588, 589 (1970). However, such Board determinations by tribunals having expertise in construction contract matters can be helpful even if not compelling on the court. *United States v. Lockheed Corp.,* 817 F.2d 1565, 1567 (Fed.Cir.1987); *Erickson Air Crane Co. of Washington, Inc. v. United States,* 731 F.2d 810, 814 (Fed.Cir.1984). *See also Hegeman–Harris & Co. v. United States,* 194 Ct.Cl. 574, 580, 440 F.2d 1009, 1011 (1971).

With the above standards fully in mind, the court turns its attention to the issues on which plaintiff focuses its attack on the Board's determinations and decision.

### A. *The Critical Path Method Schedule Issue*

In *Haney v. United States,* 230 Ct.Cl. 148, 167–168, 676 F.2d 584, 595 (1982), the critical path method (CPM) of construction was described in pertinent part:

> Essentially, the critical path method is an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects. Each subproject is identified and classified as to the duration and precedence of the work. (*E.g.,* one could not carpet an area until the flooring is down and the flooring cannot be completed until the underlying electrical and telephone conduits are installed.) The data is then analyzed, usually by computer, to determine the most efficient schedule for the entire project. Many subprojects may be performed at any time within a given period without any effect on the completion of the entire project. However, some items of work are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed. These latter items of work are on the 'critical path.' A delay, or acceleration of work along the critical path will affect the entire project. * * *

*See G.M. Shupe, Inc. v. United States,* 5 Cl.Ct. 662, 667–78 (1984).

The contract between plaintiff and GSA contained, as part of the specifications, Section 0118 entitled "Critical Path Method of Planning and Scheduling." The Board held that Section 0118, "which deals with a computer based CPM schedule, prescribes a tool for Government use rather than a device for the contractor's management of the job." The Board further held that plaintiff "was not contractually entitled to use, nor was the Government contractually obliged to furnish, a CPM schedule suited to appellant's requirements as prime contractor * * *." 85–1 BCA ¶ 17,816 at 89,-102–89,103. Plaintiff attacks these holdings. A reasonable reading of Section 0118

---

8. One who attacks a Board finding of fact must cite to the administrative record in support thereof. *Chaney and James Constr. Co. v. United States,* 190 Ct.Cl. 699, 720, 421 F.2d 728, 740 (1970). The absence of appropriate record citations, especially in a case with a large record, can prove fatal, for it is not incumbent on the court to undertake an examination of a voluminous record in a search for pertinent evidence. *Id.* at 720, 421 F.2d at 740. That is plaintiff's burden. *Electronic & Missile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 252–53, 256, 263, 416 F.2d 1345, 1354–55, 1357, 1362 (1969).

in the context of the Board's findings of fact, which are found to be supported by substantial evidence, leads the court to conclude that plaintiff's attack is weak and unpersuasive.

The Board's detailed findings of fact on the CPM issue can be found in Findings of Fact Nos. 8–42, 85–1 BCA ¶ 17,816 at 89,-057–89,066, and its discussion thereon can be found in *id.*, at 89,102–89,104. Plaintiff has not attacked the Board's findings of fact in a manner which would enable the court to consider said objections without undertaking an examination of the voluminous record in this case on a page by page, document by document basis. See note 8, *supra.* The court declines to do this. *Sundstrand Turbo v. United States,* 182 Ct.Cl. 31, 60, 389 F.2d 406, 422–23 (1968). As a result, the Board's factual findings on the CPM issue, which have not been shown to be erroneous or unsupported by substantial evidence, are entitled to finality.

Because the factual findings are entitled to finality, resolution of the CPM issue centers for the most part on contract interpretation. It is established that contract interpretation is a question of law. *See Foster Constr. C.A. v. United States,* 193 Ct.Cl. 587, 601, 435 F.2d 873, 880 (1970); *Arundel Corp. v. United States,* 207 Ct.Cl. 84, 97, 515 F.2d 1116, 1123 (1975). Thus, the Board's interpretation of section 0118 is not binding on the court. *See Gorn Corp. v. United States, supra,* 191 Cl.Ct. at 562, 424 F.2d at 589. However, the Board's interpretation of contract provisions, based on Board expertise, is entitled to careful consideration and should be accorded due respect. *Dale Ingram, Inc. v. United States,* 201 Ct.Cl. 56, 71, 475 F.2d 1177, 1185 (1973); *Shuey Aircraft, Inc. v. United States,* 3 Cl.Ct. 243, 245 (1983). Too,

"factual determinations that form the basis of the Board's contract interpretation are entitled to finality if supported by substantial evidence." *Dale Ingram, Inc. v. United States, supra,* 201 Ct.Cl. at 71, 475 F.2d at 1185.

Plaintiff maintains that GSA was under a duty, mandated by the provisions of section 0118, to provide plaintiff with a workable and reliable CPM schedule to construct the Federal Office Building in question.[9] A reading of section 0118 does not support plaintiff's position. As the Board correctly observed " * * * there is nothing in section 0118 that obliges GSA to maintain the computer based schedule for the benefit of the contractor or that suggests the contractor is entitled to plan its work using that schedule." 85–1 BCA ¶ 17,816 at 89,103. In the *General* provision of section 0118, part 1.1, it states, in pertinent part, "CPM Consultant [hired by GSA] and GSA will utilize Critical Path Method to analyze *Contractor's proposed operational* procedure under this contract, and to review and verify Contractor's progress throughout this project * * *" (emphasis supplied). Part 3.3 of section 0118 states in pertinent part, "[t]o *assist the contractor in initiation and maintenance of their CPM planning,* consultant will conduct an orientation seminar * * *." (Emphasis supplied.) Part 3.4 of section 0118 states in pertinent part, "CPM Consultant will translate Contractors' proposed project plan and estimated cost information into a schedule under the Critical Path Method based on information to be supplied by the Contractor * * *." Parts 3.2, 3.7, 4.1 and 4.2 of section 0118 make it clear that the GSA intended to utilize the CPM schedule it was preparing to monitor the progress of plain-

---

**9.** The Board found that the CPM schedule arrived at by the GSA was essentially useless. 85–1 BCA, ¶ 17,816 at 89,053. However, since the CPM schedule was for the government's benefit and not plaintiff's and since the plaintiff was not contractually obligated to follow, and in fact did not follow this useless CPM schedule, plaintiff is not entitled to damages merely because the schedule was defective. However, to the extent the defective schedule was utilized by the government, e.g., to support its position relative to the acceleration issue, and caused specif-

ic damage to plaintiff, then recovery may be called for. While plaintiff before the Board tried to blame early schedule delays in the work on, inter alia, inaccuracies in the CPM schedule itself, the Board found that plaintiff's home office job supervisor blamed any deficiency in this regard on lack of planning, scheduling, job progress and bilateral communications between and among plaintiff's foreman, superintendents, supervisory personnel and project management. Board Findings of Fact Nos. 93–95, 85–1 BCA ¶ 17,816, at 89,075–89,076.

tiff's performance and to estimate the progress payments to be made to plaintiff. It was not intended to serve as plaintiff's blueprint for job performance. Plaintiff, as indicated in Part 3.3 of section 0118, was expected to utilize their own CPM planning and scheduling of work. Plaintiff, while it recites other provisions of section 0118 and interpolates therefrom, ignores the provisions cited above and the reasonable conclusions that follow therefrom. For example, at oral argument plaintiff directed the court's attention to par. 3.5.5 of the contract specifications to support its position that the GSA was responsible for preparing the CPM schedule. Plaintiff argued that par. 3.5.5, dealing with the arrow diagram component of a CPM schedule, required defendant to prepare the arrow diagrams, on which a CPM schedule would be based. However, the Board responded to this argument directly, noting correctly that there was no explicit requirement in the specifications that the GSA prepare arrow diagrams. *See* 85–1, BCA ¶ 17,816 at 89,063. On the contrary, the Board findings indicate that plaintiff was preparing the arrow diagrams. *See id.* Moreover, the GSA CPM schedule was a precedence or activity mode method whereas plaintiff's CPM schedule mode was an IJ or arrow network method. (See Tr. 2960–61). Plaintiff's personnel (Terry) was not familiar with the precedence method and uncomfortable with it and did not follow or use it. Plaintiff used the arrow network in its CPM schedule. (See Tr. 3027). Thus, the record shows that defendant was not responsible for preparing the arrow network diagrams.

■ The Board's interpretation of the CPM provisions of the specifications gives reasonable meaning to all provisions of section 0118 and does not leave any portion of said section "useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous." *Bishop Engineering Co. v. United States,* 180 Ct.Cl. 411, 416 (1967) (quoting *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 395, 351 F.2d 972, 979 (1965)). The Board's interpretation of section 0118 is certainly within the "zone of reasonableness." *Bishop Engineering Co. v. United States, supra,* 180 Ct.Cl. at 416.

Further, the Board's interpretation comports with trade practice and construction experience. It is the contractor who is charged with construction of the project. He must, as a general rule, prepare a schedule of work performance and coordinate the work. A contractor must temper his CPM schedule in light of its construction experience and capabilities. It.is unreasonable to expect that a CPM schedule prepared by the government would be required which may well impinge on or interfere with the construction experiences and capabilities of the contractor. *See generally,* J. Wickwire and R. Smith, *The Use of Critical Path Method Techniques in Contract Claims,* 7 Pub.Cont.L.J. 1, 7 (1975).

The above observations comport favorably with the cases cited by plaintiff in support of its generalizations about the CPM. Plaintiff cites the following excerpt from the opinion in *E.C. Ernst, Inc. v. Koppers Co., Inc.,* 476 F.Supp. 729, 745 (W.D.Pa.1979), *rev'd. on other grounds,* 626 F.2d 324 (3d Cir.1980), a suit by a subcontractor against a prime contractor, "the C.P.M. network is a management tool. It is a guide on how to build your job...." Plaintiff seeks to infer that management means the owner (here the government) who contracts to have the work done. However, the *Ernst* case, as well as the other cases cited by plaintiff all involve prime contractors who planned and scheduled their work under CPM schedules they prepared. As noted, in pertinent part, by the Armed Services Board of Contract Appeals (ASBCA) in *Nello L. Teer,* 86–3 BCA ¶ 19,326, at 97,767 (1986), not cited by plaintiff, "CPM scheduling is a useful tool for a contractor in planning and managing its performance on a complex construction project. It can also be useful to an owner in monitoring a contractor's progress towards completion." *Id.*

In the cases cited by plaintiff, prime contractors set up CPM schedules and thereafter did not follow said schedules or abandoned them. *See United States ex rel. ... v. F.D. Rich Co., Inc.,* 439 F.2d 895, 900 (8th Cir.1971) [Miller Act suit where sub-

contractor not subject to CPM scheduled completion date established by prime contractor]; *Natkin & Co. v. Geo A. Fuller Co.,* 347 F.Supp. 17, 21 (W.D.Mo.1972) [CPM schedule prepared by prime contractor abandoned during contract performance by prime contractor for its own purposes]. Plaintiff calls the court's attention to testimony cited by the court in the *E.C. Ernst* case cited, *supra,* but neglects to cite the remainder of the testimony or place the testimony in perspective. The testimony, given by a prime contractor's resident engineer in charge of scheduling the work of subcontractors and the use of the CPM, reads as follows:

> Well, the C.P.M. network is a management tool. It is a guide on how to build your job. Basically what you do to make a C.P.M. network is you start off by finding out from the contract specs exactly what is in the contract, what you have to install, with that combination, with the experience from past jobs and you physically sit down and build the job on paper the way you are going to build it out in the field.

*E.C. Ernst, Inc. v. Koppers Co., Inc.,* 476 F.Supp. at 745.

This testimony reflects the general, usual and standard way construction projects are managed. The owner indicates by means of plans and specifications what kind of building it wants. The prime contractor, if the successful bidder, analyzes said plans and sets up its CPM schedules outlining the way it intends to perform the work and complete said work within the period called for by the contract. The owner who contracts to have a building constructed usually does not tell a contractor how to do his job. The owner relies on the contractor's "experience from past jobs" in this regard.

Supportive of its interpretation of section 0118, that plaintiff was to maintain its own CPM planning and scheduling of work, is the Board's findings of fact that plaintiff had hired its own CPM scheduler to chart the course that construction of the Patrick V. McNamara Federal Office Building should take and that its CPM implementation was to be and in fact was plaintiff's

road map for completion of the project. *See* 85-1 BCA, ¶ 17,816 at 89,075–89,076, 89,103. Further, implementation of the GSA CPM schedule was delayed. Work on the project was commenced by plaintiff on or about November 28, 1972, with an expected completion date extended to November 5, 1975. Because of delays in the establishment of the GSA CPM schedule, a change order, dated March 20, 1973, was issued which extended the date the GSA CPM would begin serving as the basis for progress payments to plaintiff. 85-1 BCA, ¶ 17,816 at 89,063. On August 10, 1973, only a few weeks after the contracting officer had approved the GSA CPM schedule for progress payments to plaintiff, plaintiff's CPM schedule was already plaintiff's construction "road map." 85-1 BCA, ¶ 17,816 at 89,103. There is no surer way to find out what the parties meant and intended than to see what they had done. *Insurance Co. v. Dutcher,* 95 U.S., (5 Otto) 269, 273, 24 L.Ed. 410 (1877). *See Croce v. Kurnit,* 737 F.2d 229, 235 (2d Cir.1984); *Octagon Process, Inc. v. United States,* 141 Ct.Cl. 599, 604 (1958) (Intent of parties inferred from contract as whole as well as conduct of parties rendering performance.); *Chahroudi v. United States,* 124 Ct.Cl. 792, 797–98 (1953). *See also Jetco, Inc. v. United States,* 11 Cl.Ct. 837, 847 (1987).

Plaintiff's actions during contract performance clearly support the Board's conclusion that the GSA CPM schedule was not intended to be, nor was it, the "roadmap" for completion of the project. Plaintiff's own CPM schedule was to control, and it did control the progress of the work. The GSA CPM schedule was used for payment purposes only as testified by plaintiff's scheduler and CPM expert (see Tr. 3077–3082).

While plaintiff stresses that it was more than 120 days into the project before the GSA CPM schedule would have been available to him, (if the original GSA CPM had not proven defective) no evidence was presented to the Board that such delay hampered its construction progress. Plaintiff worked on the project from November 1972 until August 1973 under its own work schedule. It is reasonable to infer, as did

the Board, in the absence of specific evidence to the contrary, that plaintiff must have relied on its own planning efforts to accomplish scheduled construction during the time GSA was assembling its CPM schedule. Otherwise, nothing could have gotten off the ground. Any interest plaintiff could have relative to a delayed GSA CPM schedule would concern receipt of progress payments since the GSA CPM schedule was to be the basis for such payments, (See Tr. at 3077–3078, 3082).

Moreover, it is reasonable to conclude that an experienced contractor would intend to manage and control construction work and would start work thereon immediately. A contractor would not do this if it believed that it had to wait for a government-imposed schedule to begin work on the project.

The Board found that plaintiff did not intend to, nor did it rely on, the computerized GSA CPM schedule. The Board found that plaintiff understood the limited purpose of the CPM schedule and, therefore, hired its own CPM scheduler to plan its own job. No substantial evidence was presented that plaintiff did rely on the CPM schedule and, in fact, the totality of the record supports the opposite conclusion. It is not unreasonable to assume that a contractor about to build a 27–story office complex and garage would rely on its own planning resources and abilities to develop a schedule of construction attuned to its work method and habits unless specifically precluded from doing so by clearly stated contract provisions. No such clearly stated contract provisions existed in the contract. What was clear in the contract was that the government desired a Critical Path Method schedule to enable it to make progress payments to plaintiff and to monitor plaintiff's performance, goals that benefit the government.

Plaintiff's contentions on the CPM issue rest on the inaccuracies and uselessness of the GSA CPM schedule as a tool for charting and managing contract performance. As indicated above, the GSA CPM schedule was not intended to serve as such a tool. Assuming arguendo it was so intended, it would not help plaintiff's cause. The Board noted that the GSA CPM schedule was probably inaccurate to begin with, as a result of derelictions by both GSA and plaintiff. Even if, the Board found, the GSA CPM schedule was accurate early on, it soon ceased to be so and, again, both parties share the responsibility for this, as they do for any initial inaccuracies. 85–1 BCA ¶ 17,816, at 89,804. The plaintiff has failed to show that the Board's findings in this regard were erroneous or unsupported by substantial evidence. Since plaintiff is as responsible as GSA for the GSA CPM deficiencies (it is to be remembered section 0118 imposed obligations on plaintiff to supply data, etc., relative to the composition of the GSA CPM schedule), it is in a poor position to seek damages based on such deficiencies. The Board was unable to apportion the degree of blame which should be attributed to either party in this regard. Under these circumstances, no recovery can be had, in any event, by plaintiff on the CPM issue. *See Marshall v. United States*, 143 Ct.Cl. 51, 56, 164 F.Supp. 221, 224 (1958); *Hargrave v. United States*, 132 Ct.Cl. 73, 81, 130 F.Supp. 598, 602–03 (1955).

Plaintiff relies on *Scherr & McDermott, Inc. v. United States*, 175 Ct.Cl. 440, 360 F.2d 966 (1966) in support of its position that the mere fact that the GSA CPM schedule was useless and inaccurate is sufficient to find the Government responsible for plaintiff's damages. However, a close reading of that case, on the facts before the Board, supports defendant's position. As stated in *Scherr*, "[t]he failure of the Government to perform the required audits [produce an adequate CPM schedule] does not in itself entitle plaintiff to monetary relief." *Scherr & McDermott, Inc. v. United States*, 175 Ct.Cl. at 446, 360 F.2d at 969. The failure to supply such a CPM schedule must be shown to be the cause specifically of the damages claimed. In the case at bar, plaintiff failed to establish before the Board the existence of delay in performance which was due to the GSA CPM schedule. This failure is critical to its right to recover in any event.

Plaintiff's various attacks on the Board's legal conclusions and factual findings on the CPM issue have not shown them to be wrong as a matter of law or lacking in substantial evidence. In a Wunderlich Act case, the role of the Claims Court is not to determine whether the court would agree with each finding were the court to make the finding itself; rather, the court's inquiry is strictly limited to whether the Board's decision was supported by substantial evidence. *See Iconco v. United States,* 6 Cl.Ct. 149, 152–53 (1984), *aff'd,* 770 F.2d 179 (Fed.Cir.1985). A careful review of the Board's decision leads the court to the conclusion that on the CPM issue the Board's factual determinations are supported by substantial evidence and the Board's interpretation of the contract is not unreasonable.

### B. *The Acceleration Issue*

The Board found, as a fact, that GSA, by letter dated February 28, 1974, had ordered plaintiff to accelerate its work performance based on GSA's inaccurate CPM schedule (see note 9, *supra*), but awarded no compensation relative to said order because plaintiff failed to provide adequate proof that it did anything different as a result of the issuance of said order.[10] The Board's detailed findings of fact on this issue can be found at 85–1 BCA ¶ 17,816, at 89,078–89,081, and the discussion thereon can be found at *Id.* at 89,107–89,109.

The government does not contest the Board's determination that the February 28, 1974 letter constituted an acceleration order, and, rightly so. *See Norair Engineering Corp. v. United States,* 229 Ct.Cl. 160, 165, 666 F.2d 546, 549 (1981), cited by the Board. *See also Fortec Constructors v. United States,* 8 Cl.Ct. 490, 506–08 (1985). Plaintiff, however, does contest the Board's refusal to compensate it for the issuance of this acceleration order. Whether plaintiff suffered damages as a result of the issuance of the acceleration order is clearly a question of fact. As a result, the Board's determination on the acceleration

issue is entitled to finality if supported by substantial evidence and is not otherwise arbitrary or capricious. The Board analyzed the record and concluded it could find no evidence that plaintiff or its subcontractors actually accelerated their work as a result of the February 28, 1974 acceleration order. Thus, plaintiff's acceleration claim was denied for lack of proof that it suffered any damage because of the acceleration order. The Board correctly observed that "[i]t is not enough to be told to accelerate and to promise to do it. One must accelerate" [in order to be entitled to compensation relative thereto]. 85–1 BCA ¶ 17,816, at 89,108.

It is plaintiff's burden to prove, by appropriate citations to the administrative record, that the Board's factual determinations are not entitled to finality under the Wunderlich Act. Plaintiff does point to some instances in the record for support for its position that it did accelerate work in response to the February 28, 1974 order, but these isolated citations are unavailing when analyzed. The fact that the record contains evidence favorable to plaintiff does not carry the day for plaintiff. It is settled that even uncontradicted testimony is not conclusive if it is intrinsically nonpersuasive. *Sternberger v. United States,* 185 Ct.Cl. 528, 535–36, 401 F.2d 1012, 1016 (1968). The evidence relied on by plaintiff is not "overwhelmingly" contrary to the Board's findings of fact on the acceleration issue and, as a result, the court must affirm such findings. *Koppers Co. v. United States,* 186 Ct.Cl. 142, 150–51, 405 F.2d 554, 559 (1968); *Gevyn Constr. Corp. v. United States,* 11 Cl.Ct. 203, 206 (1986), *aff'd,* 827 F.2d 752 (Fed.Cir.1987).

The Board's findings that there was no substantial evidence in the record that plaintiff made any effort to accelerate in response to the February 28, 1974 order must be accepted since plaintiff has failed to carry its burden to establish the contrary in accordance with Wunderlich Act

---

**10.** At the time GSA issued the February 28, 1974 letter, it was aware that its CPM schedule failed

to show a time extension of 48 days to which plaintiff was entitled as a result of a strike.

review standards.[11] *See Sundstrand Turbo v. United States, supra,* 182 Ct.Cl. at 60, 389 F.2d at 422–23. *See also Vista Scientific Corp. v. United States,* 808 F.2d 50, 53 (Fed.Cir.1986) (Arguing facts "without showing any relationship between them and board findings" does not satisfy plaintiff's burden). Further plaintiff failed to carry its burden of showing, in accordance with Wunderlich Act review standards, that the Board's finding that there was no actual acceleration directly related to the February 28, 1974 order was unsupported by substantial evidence or was otherwise arbitrary or capricious.[12] *See Vista Scientific Corp. v. United States, supra,* 808 F.2d at 53. *See also LSI Service Corp. v. United States,* 191 Ct.Cl. 185, 188, 422 F.2d 1334, 1335–36 (1970).

In any event, the Board found that even if one were to conclude that plaintiff did accelerate its work, any such acceleration "had only the effect of offsetting delays attributable to [plaintiff's] performance." 85–1 BCA ¶ 17,816, at 89,053.

The Board's decision on the acceleration issue denying plaintiff's claim must be upheld. The court refuses to reweigh the evidence before the Board, which is the request implicit in the manner in which plaintiff has presented this issue to the court, to see if it would agree with each

finding were it to make each such finding itself. *See Dean Constr. Co. v. United States,* 188 Ct.Cl. 62, 67–68, 411 F.2d 1238, 1241 (1969). It bears repeating again, that it is not the court's function to make an independent *de novo* review of the record to support, if it can, plaintiff's claim. *Wickham Contracting Co. v. United States,* 212 Ct.Cl. 318, 322, 546 F.2d 395, 397 (1976).

C. *Differing Site Condition Issue*

■ This issue is covered in the Board's findings of fact, 85–1 BCA ¶ 17,816, at 89,071–89,074, under the heading, "The Tension Piling and Contaminated Artesian Water", and in the Board's discussion, 85–1 BCA ¶ 17,816, at 89,105–89,107, under the heading, "The Tension Piles". Plaintiff does not contest the Board's findings of fact on this issue. Plaintiff's position rests on the contention that the Board erred as a matter of law in concluding that an award was due plaintiff based on differing site conditions rather than based on defective specifications. Plaintiff's position is deemed to be without merit.

The contract initially called for a parking structure to rest on a mat, but without caissons. Instead of caissons, tension pilings would be used to resist uplift pressure. The contract called for the tension piles to go vertically into the earth to hold

---

11. Plaintiff attacks the Board's findings on the acceleration issue by alleging that the Board failed to give more weight in its determinations to the alleged impact of various changes which took place after January 1, 1976, when the government accepted beneficial occupancy of the building in question. The Board's findings, unchallenged by plaintiff, that these changes were, without any apparent exception, limited in scope to one comparatively small area of the building and that none of the changes was of great significance, effectively defuses this attack. Board Finding 189, 85–1 BCA ¶ 17,816, at 89,095. Plaintiff argues that there was evidence in the record of double shifts, overtime and increased production subsequent to February 28, 1974. However, assuming this to be so, it failed to show a causal connection between double shifts, overtime and increased production and the acceleration order in question. Such a failure on its part precludes recovery in its favor. *See Norair Eng'r. Corp. v. United States, supra,* 229 Ct.Cl. at 166, 666 F.2d at 550; *see also Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 199, 351 F.2d 956, 968–69 (1965).

This is so whether the trial is bifurcated or not. While the amount of damages is not required to establish liability, a contractor, in order to obtain an acceleration order liability determination must establish that it, in fact was ordered to accelerate performance and, in fact, incurred damages as a direct result of said acceleration order. *Norair Eng'r. Corp. v. United States, supra,* 229 Ct. Cl. at 164, 666 F.2d at 548.

12. Plaintiff contends, for example, that improvement in the pace of structural work in the tower, which took place after the February 28, 1974 order, suggests efforts to accelerate relative to said order. However, the Board found that other equally plausible reasons accounted for said improvement. Specifically, the Board found the improvement was more likely due to (a) improvement in learning curve of workers; (b) plaintiff did not encounter same problems on upper floors that it did on lower floors; and (c) plaintiff's performance improved not in response to acceleration order but in order to save money. 85–1 BCA ¶ 17,816, at 89,108.

down the horizontal concrete mat that underlay the garage area.

On February 22, 1974, while drilling the sockets for the tension piles, plaintiff encountered artesian water. Its equipment was inadequate to handle the resulting leakage.

An initial change order, issued on March 15, 1974 attempted to solve the problems by installing the tension piles using pre-grouting techniques. This attempted solution failed.

On May 7, 1974, a government proposal to eliminate tension pilings was adopted. As approved, the proposal included a contract price reduction of $10,000, but plaintiff reserved all rights to make claims for additional compensation for extra work related to the tension piles.

On August 2, 1974, the contracting officer issued a third change order directing the clean-up of discolored electrical and plumbing materials, associated with the artesian water problems.

As a result of the elimination of the tension piling requirement, plaintiff was able to pour the garage mat without installing tension pilings.

The contract was silent as to the presence or absence of artesian water. However, the Board found that the possibility of finding sulfur water gas at the construction site was a matter of common knowledge. Plaintiff, as an experienced contractor, should have been aware of it, and GSA at a minimum should be charged with such knowledge.

The Board granted plaintiff an equitable adjustment under the standard differing site conditions clause of the contract resulting from the discovery of contaminated artesian water during the tension pile drilling.

Even though the Board found in its favor, plaintiff now argues before the court that the discovery of artesian water represented defective specifications [13] and not a differing site condition.

The court rejects plaintiff's premise that such a change in perspectives is called for in this case. Plaintiff's claim as to the tension pilings was fully redressable under the contract. In the interests of justice, the court cannot permit him "to maintain a separate claim for breach which is merely a recharacterization of the claim which is redressable under the contract." *Edward R. Marden Corp. v. United States*, 194 Ct.Cl. 799, 808, 442 F.2d 364, 369 (1971).

The authorities plaintiff relies on in support of its attack on the Board's determination are misplaced. In *J.D. Hedin Construction Co. v. United States*, 171 Ct.Cl. 70, 347 F.2d 235 (1965), the claimed differing site condition was never identified. In that case, the court emphasized that the government:

> [did] not at any place in its brief state just what the changed conditions were. The density of the subsoil and existence of highly resistant materials were known at the time the specifications were drawn. These were the exact conditions which were encountered and prevented the thin-shelled piles from being driven properly.

*J.D. Hedin Construction Co. v. United States*, 171 Ct.Cl. at 81, 347 F.2d at 244. In *J.D. Hedin*, boring logs disclosed compact sand and gravel and the existence of highly resistant materials. Defendant prepared its specifications on the basis of this and other information. *See id.* at 77–78, 347 F.2d at 242.

The case at bar is clearly distinguishable. In this case, the differing site conditions were clearly identified by the Board. The contract in question indicated nothing about the presence of artesian water. If the conditions were as represented in the contract, there would have been no artesian water and no problem with the tension pilings. Rather than a defective design, "the design could not work in the condi-

---

**13.** For a discussion of the consequences of asserting a defective specification theory which can be treated as a claim based on a breach of the implied warranty of government-furnished specifications, see T. Patten, *The Implied Warranty That Attaches To Government Furnished Design Specifications*, 31 Fed.B.J. 291 (1972).

tions [plaintiff] encountered at the site." 85–1 BCA ¶ 17,816, at 89,105.

Plaintiff's reliance on *Perini Corp. v. United States*, 180 Ct.Cl. 768, 381 F.2d 403 (1967) is likewise misplaced. Merely because *Perini* and the case at bar share the factual finding that the contractor found artesian water does not mean the same legal conclusion should follow. At stake in *Perini* was not the quality of water, but the quantity of water pumped.[14]

In the case at bar, the contract did not mention artesian water. It was the discovery of this type of water, which represented a differing change of condition because it substantially affected the quality of water. In *Perini*, the pumping of water was expected. It was the estimated quantity, specified in the contract, which was miscalculated.

The holding in *Perini* further delineates this distinction:

We hold that a material variation from an estimated quantity, here consisting of an overrun in the amount of water to be pumped from a specified area, did not constitute a changed condition within the circumstances of this case. * * *

*Perini Corp. v. United States*, 180 Ct.Cl. at 770–71, 381 F.2d at 405.

In the case at bar, there is no "material variation from an estimated quantity." No quantity at all was anticipated. Here, the only issue is whether the presence of artesian water constituted a changed condition, not whether the change of condition clause applies. That question is one of fact and is entitled to finality under the Wunderlich standards of review. *See Arundel Corp. v. United States*, 207 Ct.Cl. 84, 97–98, 515 F.2d 1116, 1123 (1975) (Conditions actually encountered purely factual in nature and resolution by Board entitled to finality where supported by substantial evidence and not arbitrary.). Neither party contests that aspect of the case, and the court finds

no reason under the applicable statute to disturb it.

▮ As to the government's prior knowledge of said conditions, this fact goes to whether a type 1 or type 2 differing site condition existed. Plaintiff should have been aware of the possibility of hitting an artesian spring, and the GSA knew of a possible hazard from its consultant before it solicited the contract. Therefore, "conditions of an unusual nature" were not encountered (type 2). Rather, the artesian water represented conditions "differing materially from those indicated in the contract," (type 1). Such a result irresistibly follows from the factual finding that the artesian water represented a differing change of conditions. It is this factual finding which is determinative of the artesian water issue.

Plaintiff is entitled to an equitable adjustment, under the differing site condition clause of the contract, as determined by the Board. Plaintiff's claim based on defective specification was properly denied by the Board.

### D. *The Tenant Layout Drawings Issue*

▮ The tenant layout drawing issue was covered by the Board in its findings of fact at 85–1 BCA ¶ 17,816, at 89,081–89,096. A number of issues and contentions were addressed and determined by the Board in this regard. While the plaintiff's complaint contains many allegations relating to this issue, its motion for summary judgment only addresses one aspect of the Board's determinations on the matter. As indicated earlier, it is plaintiff's burden to show that the Board's determinations are factually deficient under Wunderlich Act review standards. *See LSI Service Corp. v. United States*, 191 Ct.Cl. 185, 188, 422 F.2d 1334, 1335–36 (1970). Plaintiff has failed to do this. Accordingly, the Board's findings of fact on the tenant layout draw-

---

**14.** The court stated:

Thus the situation presented by the facts before us is one where the estimated quantities contained in the contract were grossly understated by the Government. The contractor recognized that the estimate was unduly low and did not rely upon it. In view of all the information it had available to it, the Government should also have anticipated that plaintiff would encounter and have to pump more water than was pumped under the prior contract.

*Perini Corp. v. United States*, 180 Ct.Cl. 768, 788, 381 F.2d 403, 415 (1967).

ings issue are entitled to finality. Further, except for the issue, Lineal Feet of Partitions, set forth in plaintiff's brief at pages 80–81 in support of its motion for summary judgment, it is not unreasonable to consider all other possible challenges to the Board's detailed findings and determinations on the tenant layout drawings issue as abandoned since plaintiff has failed to assert them in its briefs to the court. *See Nossen v. United States,* 189 Ct.Cl. 1, 18, 416 F.2d 1362, 1371 (1969), *cert. denied,* 400 U.S. 823, 91 S.Ct. 44, 27 L.Ed.2d 51 (1970); *Prindle v. United States,* 5 Cl.Ct. 493, 495, n. 7 (1984).

The Board determined that plaintiff was required to install in the Federal Building in question 36,160 lineal feet of tenant layout partitions (floor-to-ceiling).[15] Thus, it is reasonable to assume plaintiff's bid, through its subcontractor, embraced the cost of 36,160 wall-to-ceiling partitions. The Board held that "the first 36,160 of standard floor-to-ceiling partitions installed in standard fashion are not compensable, having been included in the contract, and [plaintiff] can only recover to the extent that it establishes the Government required it to install more than 36,160 feet or insisted on something other than standard partitions in a standard installation." 85–1 BCA ¶ 17,816, at 89,111. The Board found plaintiff entitled to "an equitable adjustment (if not already given) for installation of partitions other than standard demountable ceiling partitions in other than standard fashion. * * *" 85–1 BCA ¶ 17,817, at 89,118.

In its moving brief, plaintiff challenges the Board's use of the 36,160 lineal feet figure as an inference that is unfair and inaccurate. The only statement plaintiff makes in support of this challenge is the following: "The evidence established that at the end of the FOB Project the partition subcontractor was directed by the Government's representative to deliver some 15,000 to 16,000 lineal feet of the specified partitions to other locations. (T. Miller, at

3613)" (Plaintiff's moving brief p. 80). This is a most ambiguous statement. It could be read to indicate that 36,160 lineal feet of the specified partitions were not needed for contract performance, i.e., that some 15,000 to 16,000 lineal feet were sent elsewhere, perhaps to other contract sites. It could also be read to suggest that of the 36,160 lineal feet, some 15,000 to 16,000 lineal feet of partitions were utilized in locations other than those locations initially indicated in the contract documents.

Recourse to the plaintiff's transcript citation (p. 3613) and surrounding pages shows that some 20,000 to 21,000 lineal feet of partitions were utilized in contract performance by a subcontractor and the remainder, some 15,000 to 16,000 (36,160—15,000 or 16,000) were delivered to other locations at the direction of the government and an appropriate equitable adjustment made. *See* T. Miller, Tr. 3612–3614. It is to be noted that the Board held only that plaintiff could recover if it had to install over 36,160 lineal feet of partitions. As indicated above, the Board noted that an equitable adjustment was probably made relative thereto. The record indicates plaintiff was not required to install more than 36,160 lineal feet of partitions. The manner in which this claim, as well as others, was presented to the Board created problems for the Board. *See e.g.,* 85–1 BCA ¶ 17,816, at 89,110, 89,111. This helps to explain the Board's difficulty in treating the many facets of plaintiff's less than clear contentions (see note 3, *supra*).

In any event, the Board decision, as written, is clearly supported by substantial evidence in the record and plaintiff's challenge to the Board's use of the 36,160 lineal feet figure is clearly without merit. There is no basis on the record before the court and plaintiff's presentation in its briefs to find for it as to the tenant layout drawings issue.

### E. *Abandoned Claims*

■ In its 71 page complaint plaintiff, sets forth in detail numerous allegations

---

**15.** The contract specifications, as amended, section 1021, clearly provided for 36,160 lineal feet of floor-to-ceiling partitions. Further, the subcontractor charged with partition work testified he advised plaintiff that there was 36,160 lineal feet of partitions (walls) to be furnished for the contract. (Tr. 3596)

relating to the Board's findings of fact and determinations. In its 81–page brief in support of its motion for summary judgment, however, plaintiff was more restrictive in presenting its challenges to the Board findings of fact and determinations. The government, in its response to plaintiff's motion for summary judgment and cross-motion for summary judgment noted that plaintiff's complaint included areas in which it alleged the Board's findings and determinations were erroneous; *e.g.*, delay due to encountering artesian water (complaint ¶¶ 73–103), alleged late delivery of tenant layout drawings (complaint ¶¶ 57–76), and late building interior changes (complaint ¶¶ 107–111) (defendant's moving brief at 4, n. 4).[16] However, plaintiff's brief in support of its motion for summary judgment did not in any way deal with these matters. Given the massive size of the record in this case (*see* note 3, *supra*), the detailed and thorough 67–page Board decision, it is not unreasonable to hold plaintiff to those issues which it briefed and presented to the court under its motion for summary judgment. Thus, only those issues raised by plaintiff in its motion for summary judgment have been addressed and considered by the court. Those issues, as a result, which are lurking in plaintiff's complaint but were not presented in plaintiff's motion for summary judgment are deemed waived and/or abandoned. *See Smuck v. United States*, 5 Cl.Ct. 94, 96, n. 3 (1984); *Prindle v. United States, supra*, 5 Cl. Ct. at 495, n. 7. This is not unfair to plaintiff for in its reply to defendant's cross-motion for summary judgment plaintiff made no response to defendant's moving brief at 4, n. 4, cited above, wherein defendant asserted that those issues not raised in plaintiff's brief although set out in the complaint be deemed to have been waived.

16. On the other hand, defendant notes that the artesian water issue (differing site condition vs. defective specifications) and the 36,160 lineal feet of tenant layout partitions issue were not stated in plaintiff's complaint as filed with the court but were subjects of plaintiff's motion for summary judgment. Defendant addressed these

*Conclusion*

For reasons set out above, plaintiff's motion for summary judgment is denied and defendant's cross-motion for summary judgment is granted. The clerk is directed to enter judgment dismissing the complaint. No costs.

two issues in its cross-motion for summary judgment. Plaintiff however, in its response to defendant's motion did not reply to said motion relative to these two issues. The court did consider these issues but was not compelled to do so under the circumstances.